The YANKEE CANDLE COMPANY, INC., Plaintiff,

v.

BRIDGEWATER CANDLE COMPANY, LLC, Defendant.

No. Civ.A. 98–30226–MAP.

United States District Court, D. Massachusetts.

June 8, 2000.

Mary R. Bonzagni, Law Offices of Donald S. Holland, Longmeadow, MA, Donald S. Holland, Holland & Bonzagni, P.C., Longmeadow, MA, Gregory L. Baker, Howrey Simon Arnold & White, Washington, DC, Colin Foley, Howrey Simon Arnold & White, Washington, DC, Cecil E. Key, Jr., Baker Botts, L.L.P., The Warner, Washington, DC, for Yankee Candle Company, plaintiff.

Bruce R. Parker, Katherine M. Hamill, Foley, Hoag & Eliot, Boston, MA, Jeffrey M. Karmilovich, Richard M. Moose, Dority & Manning, Greenville, SC, Michael A. Albert, Wolf, Greenfield & Sacks, Boston, MA, for Bridgewater Candle Company, LLC, The, defendant.

*MEMORANDUM REGARDING DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT* (Docket Nos. 78, 130 & 134)

PONSOR, District Judge.

## I. INTRODUCTION

In 1998, the Yankee Candle Company ("Yankee") sued Bridgewater Candle Company ("Bridgewater") on five counts: 1) for violation of Yankee's copyright on nine of its candle labels; 2) for false designation of origin under the Lanham Act, 15 U.S.C. § 1125(A); 3) for common law trade dress infringement; 4) for tortious interference; and 5) for deceptive trade practices under Massachusetts law. Bridgewater has now moved, under FED.R.CIV.P. 56 for summary judgment on all counts, claiming there are no genuine issues of material fact justifying a trial. For the reasons set forth below, the motions for summary judgment will be allowed in part, and denied in part. The motions for summary judgment on the copyright, trade dress, and common law trade dress claims will be allowed, and the motion for summary judgment on the two remaining state law claims will be denied.

## II. FACTS AND PROCEDURAL HISTORY

The Yankee Candle Company is a leader in the candle industry. Based in Massachusetts, Yankee manufactures and sells a wide variety of candles, including what it calls its "Housewarmer" line. This line contains various kinds of candles including: jarred candles of different sizes, pillar candles, votive candles, and scalloped, tart-shaped candles. Each candle in the line shares some common characteristics: for example, all the jarred candles feature a photographic label, with the Yankee name at the top and the "Housewarmer" name at the bottom. The jars are embossed with the Yankee name as well. The name of the fragrance appears at the center of the label, in a gold-outlined, title plate with a white background. The pillar, votive (both wrapped and unwrapped), and tart-shaped candles share the same label design. The "Housewarmer" line entered into the market in 1995, and, according to Yankee, has been extraordinarily popular with consumers since then.

In 1998, the Bridgewater Candle Company made its entrance into the candle industry with a line of candles that resembled Yankee's "Housewarmer" line. Bridgewater's line featured jarred candles, pillar candles, votive, and tart-shaped candles with similar contours, similar rectangular labels, and similar title plates. Bridgewater also used photographs on the labels to depict its fragrances.

Yankee filed suit against Bridgewater in late 1998, alleging copyright violation and violation of its rights under federal and common law trade dress law. Yankee also

claimed Bridgewater had committed tortious interference with Yankee's business relationships and violated the Massachusetts Consumer Protection laws.

Immediately after filing its complaint, Yankee moved for a preliminary injunction, seeking to prevent the sale of the alleged infringing products. In May 1999, the court denied Yankee's motion. In December 1999, Bridgewater filed its motions for summary judgment on all claims. In response, Yankee has produced extensive affidavits and deposition extracts, containing statements from both parties' employees and consumers in support of Yankee's position. Counsel appeared for oral argument on March 13, 2000.

## III. *DISCUSSION*

When the pleadings and evidence present no genuine issues of fact, a movant is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c). It is appropriate to enter summary judgment against a party who has failed to make a showing sufficient to satisfy an element of its case, on which that party would bear the burden at trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In determining whether summary judgment is appropriate, the court must draw all reasonable inferences in favor of the non-movant. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Celotex,* 477 U.S. at 330 n. 2, 106 S.Ct. 2548.

### A. *Copyright Claim*

■ To prevail on a claim of copyright infringement, a plaintiff must show two things: ownership of a valid copyright and illicit copying by the defendant. *See Feist Publications, Inc. v. Rural Tel. Serv. Co., Inc.,* 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991); *Matthews v. Freedman,* 157 F.3d 25, 26–27 (1st Cir.1998). There is no dispute in this case that Yankee Candle retains a valid copyright for the nine candle labels at issue: French Vanilla, Eucalyptus, Cinnamon, Spiced Apple, Cranberry, Gardenia, Mulberry, Fresh Peach, and Raspberry. Thus, the discussion will necessarily focus on the second element of a copyright infringement claim—copying itself.

In some cases, it is possible to show the defendant saw and literally copied the plaintiff's work; in other words, it is sometimes possible to show "actual copying". This is not such a case. Here, the dispute centers around more nuanced questions: what aspects or elements of Yankee's work are protectable under copyright law, and were those specific, protectable aspects or elements copied by Bridgewater? *See Matthews,* 157 F.3d at 27.

The First Circuit has articulated a two-part test to assess whether copyright infringement has occurred. First, the court must determine whether there has been copying. This step involves "dissection" of a work or works.

> By dissecting the accused work and identifying those features which are protected in the copyrighted work, the court may be able to determine as a matter of law whether or not the former has copied protected aspects of the latter. The court may also determine ... those aspects of the work that are protected by the copyright and that should be considered in the subsequent comparative analysis....

*Concrete Machinery Co. Inc., v. Classic Lawn Ornaments, Inc.,* 843 F.2d 600, 608–09 (1st Cir.1988) (internal citations omitted). Second, the court must apply the "ordinary observer test ... to determine whether the copying resulted in substantial similarity between the works." *Id.*

### 1. *Protectable Elements*

■ Copyright protection has several well-recognized limitations. Most importantly, while copyright law protects the original expression of ideas, it does not protect the ideas themselves. *See Feist,* 499 U.S. at 345–51, 111 S.Ct. 1282; *Matthews,* 157 F.3d at 26. In other words, the

"underlying idea, even if original, cannot be removed from the public realm." *Matthews,* 157 F.3d at 26.

■ Hand in hand with this notion go the theories of "merger" and "scenes a faire." When there is only one way to express an idea, that idea is said to "merge" with the expression and thus bar copyright protection. *See Concrete Machinery,* 843 F.2d at 606. Even when the idea and the expression are not completely inseparable, there may only be a limited number of ways of expressing the idea. *See id.* In these situations:

> the burden of proof is heavy on the plaintiff who may have to show 'near identity' between the works at issue. This showing is necessary because, as ideas and expression merge, fewer and fewer aspects of a work embody a unique and creative expression of the idea; a copyright holder must then prove substantial similarity to those few aspects of the work that are expression not required by the idea.

*Id.* at 606–07 (internal citations omitted).

Courts must also take into account the degree of originality of the subject matter. Expressions of those subjects that are common and everyday often necessarily appear similar to other expressions of the same subject. *See id.* at 607.

■ A look at Yankee's nine copyrighted labels clarifies not only these legal concepts, but also their obvious application to the case. For six of Yankee's labels—Eucalyptus, Cranberry, Gardenia, Mulberry, Fresh Peach, and Raspberry—merger applies. There is only one way to express the idea of these fruits and flowers: by depicting their likenesses. This can be done only by a photograph or drawing; there is simply no other way to express the idea of a fruit or a flower. Even for the remaining three labels at issue— French Vanilla, Cinnamon, and Spiced Apple—the idea merges with the expression. Very few ways exist to express the idea of Cinnamon; one can use cinnamon sticks or cinnamon buns. In the same way, few ways are available to express the idea of French Vanilla or Spiced Apple, namely with ice cream, vanilla beans, apples, or apple pie. Yankee argues there is an infinite number of ways to depict these fragrances, and therefore the theory of merger cannot apply. No jury could so find. To repeat what is painfully obvious, only a limited number of ways are available to express fruits, flowers, and even the more subtle images of French Vanilla, Cinnamon, and Spiced Apple.

Moreover, both Yankee's and Bridgewater's labels are depicting the most ordinary of subjects, in the most ordinary of ways and as such, "similarity that inevitably stems solely from the commonality of the subject matter is not proof of unlawful copying." *Concrete Machinery,* 843 F.2d at 607, quoting *Durham Industries, Inc. v. Tomy Corp.,* 630 F.2d 905, 913 (2d Cir. 1980). As the court winds its way through the dissection process, it will become clear that the ideas in Yankee's labels merge almost completely with their expression. Given this, it is necessary, at summary judgment, for Yankee to point to evidence that would permit a jury to conclude that their labels are "nearly identical" to Bridgewater's labels.

■ The concept of "scenes a faire" is a bit more elusive. It embodies the notion that certain ideas are conventionally expressed in ways that reflect similarities in settings that necessarily flow from a common theme. *See Pampered Chef, Ltd. v. Magic Kitchen, Inc.,* 12 F.Supp.2d 785, 790 (N.D.Ill.1998). So, if one were assembling a kitchen supply catalogue, the catalogue might naturally show pie pans with pies, cookies with cookies sheets, and so forth. *See id.* at 791. In other words, there are certain ideas that are so inextricably linked, that they must be shown together in order to be fully understood, or even to make sense. *See id.* While the pie pan and the pie may be inextricably linked, however, the kind of pie, the type of topping, the "angle, the garnish, and the na-

ture and placement of things surrounding the pie are by no means fixed." *Id.* Thus, although the placement of the pie with its pan is a "scene a faire," and as such not protectable by copyright law, the specific attributes of the pie are indeed protectable. *Id.*

Again, a look at one of Yankee's labels and the corresponding Bridgewater label lends some insight into the workings of the "scenes a faire" doctrine. As noted, vanilla ice cream or perhaps vanilla beans most naturally convey the idea of "French Vanilla." Vanilla beans are not particularly attractive or self-explanatory, and vanilla ice cream on its own, does not do all it can to express clearly the idea of French Vanilla. Thus, both parties here have chosen to use the ice cream cone as the best vehicle by which to express the same idea. The use of the cone is the logical extension of the idea of vanilla ice cream. Indeed, the cone and the ice cream are so inextricably linked that, when one sees a cone, it need not even be filled with ice cream to create the desired association. Thus, both parties' use of the same object constitutes a scene a faire. No one person or company can have a protectable copyright on the expression of an ice cream cone to clarify or elucidate the idea of vanilla. A cone is a logical accoutrement to the idea of vanilla.

■■■ In addition to the above limitations on protection, photographs enjoy special consideration in copyright law. On the one hand, it is well-established that copyright protection does extend to photographs. *See Burrow–Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 4 S.Ct. 279, 28 L.Ed. 349 (1884); *Rogers v. Koons*, 960 F.2d 301 (2d Cir.1992). On the other hand, a photograph is only protected in so far as it contains *original* elements. *See Rogers*, 960 F.2d at 307 (stating "copyright protection extends to those elements of the photograph that are original to the creator."). Hand in hand with that goes the idea that no one can copyright a photograph of, for example, a strawberry; one

can only copyright the photograph of the *particular* strawberry used, with all of its unique characteristics. Elements of originality in a photograph include posing of the subject, lighting, angle, and "almost any other variant involved". *Id.* In cases where the photographs depict common, ordinary subjects that would be difficult to distinguish, the copyrighted photograph and the allegedly infringing photograph must be "almost perfectly identical." *Pampered Chef,* 12 F.Supp.2d at 793 (stating also "Pampered Chef cannot copyright the concept of strawberry desserts.... What it can copyright is that particular photograph of the products" and requiring that the infringing photograph be "almost verbatim" of copyrighted material.).

Application of this doctrine to this case is clear. Yankee cannot copyright the depiction of the common fruits and flowers, and even other ideas it seeks to protect. It can only copyright its particular photograph of that fruit or flower, or other idea. The court must then assess whether Bridgewater's photograph of a cranberry, for example, is "almost perfectly identical" or a verbatim copy of Yankee's photograph of a cranberry, taking into account the protectable elements of lighting, positioning, and angle. *See Rogers,* 960 F.2d at 307; *Pampered Chef,* 12 F.Supp.2d at 793.

The first part of the analysis of copyright infringement is now complete: the court has determined what aspects of the nine labels are protectable. To repeat and to summarize, all of the copyrighted labels depict ideas that merge with their expressions, some more dramatically than others, but all to some extent. In such situations, the First Circuit directs courts to look for "near identity" in their analyses. *See Concrete Machinery,* 843 F.2d at 606. In addition, and perhaps most importantly, all the contested labels contain photographs of common subjects. In these kinds of cases, courts are directed to look for "identical" or "verbatim" copies that employ virtually identical uses of lighting, angle, and positioning. *See Rogers,* 960 F.2d at

307; *Pampered Chef*, 12 F.Supp.2d at 793. Taking this "dissection" into account, the court must now must apply the second part of the test, and determine whether any of the protectable elements has been copied.

### 2. *Copying of Protectable Elements: Substantial Similarity and the "Ordinary Observer Test"*

■ In order to prevail on a claim of copyright infringement, a plaintiff must prove that the infringing material is "substantially similar" to its own protected material. While summary judgment *can* be appropriate in a copyright suit, the motion must be denied when the question of "substantial similarity is one on which reasonable minds can differ." *Rogers*, 960 F.2d at 307. In *Costello, Erdlen & Co., Inc. v. Winslow, King, Richards & Co.*, 797 F.Supp. 1054, 1063 n. 17 (D.Mass.1992), the district court noted that the Second Circuit has warned "[b]ecause substantial similarity is customarily an extremely close question of fact summary judgment has traditionally been frowned upon in copyright litigation." (Citations omitted). As will be seen, the record in this case is such that reasonable minds could *not* differ on the question of substantial similarity. *See Segrets, Inc., v. Gillman Knitwear Co., Inc.*, 207 F.3d 56, 62 (1st Cir.2000) (summary judgment may be appropriate on question of substantial similarity).[1]

■ Whether substantial similarity exists between copyrighted material and infringing material is determined by applying the "ordinary observer test." The test asks, "whether the accused work is so similar to the plaintiff's work that an ordinary reasonable person would conclude that the defendant unlawfully appropriated the plaintiff's protectable expression by taking material of substance and value." *Concrete Machinery*, 843 F.2d at 607,

quoting *Educational Testing Services v. Katzman*, 793 F.2d 533, 541 (3d Cir.1986). It is important to recall that the substantial similarity and ordinary observer tests *only* apply to those elements in the copyrighted work that are protectable. *See Concrete Machinery*, 843 F.2d at 607. In other words, for those products that merge with their expressions and for which Yankee cannot receive any copyright protection, the substantial similarity test *only* applies to those aspects of the work which are *not* merged. *See id.* ("as ideas and expression merge, fewer and fewer aspects of a work embody a unique and creative expression of the idea; a copyright holder must then prove substantial similarity to those few aspects of the work that are expressions not required by the idea.")

■ The analysis unfolds as follows. First, the court must apply the substantial similarity test to those protectable aspects of the material, however few those aspects might be. Second, as the First Circuit suggests in cases involving the doctrine of merger, the court must evaluate the copyrighted material along with the alleged infringing material for "near identity." *See Concrete Machinery*, 843 F.2d at 606. Third, in the case of photographs, the court must look for "identical" or "verbatim" copies that employ virtually identical uses of lighting, angle, and positioning. *See Rogers*, 960 F.2d at 307; *Pampered Chef*, 12 F.Supp.2d at 793. Although the court will perform these multiple analyses label by label below, it will be helpful first to lay out those parts of the analysis that result in common findings.

Preliminarily, it cannot be disputed that there is really only one way to convey the notion of Eucalyptus, Cranberry, Gardenia, Mulberry, Peach, and Raspberry, and that is through the medium of a drawing or photograph. Thus the idea behind these fruits and flowers merges with their

---

1. The *Segrets* court upheld summary judgment for the plaintiffs, holding that there was clear substantial similarity in a case where there was the rare evidence of "actual copy-ing" and no articulable differences between the accused work and the copyrighted work. *See id.* at 62.

expression. When there is effectively only one way to express an idea, copyright is no bar to copying that expression. *Concrete Machinery*, 843 F.2d at 606. Thus, Yankee cannot receive protection against Bridgewater's use of a photograph of Eucalyptus or any of the other five fragrances, *per se.*

The analysis does not end there, however; if the photographs are identical in posing, lighting, and angle, Yankee can receive protection. Certainly, no one could argue that the two sets of labels do not share certain similarities. They both, for example, use a rectangular, gold-bordered name plate, full-bleed photos,[2] and similarly sized labels. Since these crude, physical elements do not enjoy copyright protection—a gold border is a functional, not an expressive, feature in any event—the court will proceed to a specific analysis of the individual labels.

### a. *Eucalyptus*

A side by side analysis shows that the photographic labels are substantially dissimilar. First, the companies' names appear in different places within the labels. Second, the Yankee label employs a focusing device in which the closer leaves and flowers are in sharp focus, while the more distant leaves and flowers are blurry, whereas the Bridgewater photograph is uniformly focused for distance and depth. Third, the Yankee label takes a much closer look at the plant while the Bridgewater label has a more distanced view. The two labels are not identical, nor are they nearly identical. They employ different uses of lighting, focus, and positioning. No reasonable person could conclude that the two Eucalyptus labels are "substantially similar" as that term has been defined in the case law.

### b. *Cranberry*

Again, a side by side analysis labels shows these photographic labels to be sub-

stantially dissimilar. First, as before, the companies' names appear in different places on the labels. Second, Yankee uses many more green leaves than Bridgewater uses, and intersperses the leaves so that they appear with almost as much frequency as the berries themselves; Bridgewater uses so few leaves they fade into the spaces. Third, Yankee uses bigger berries and positions them closer to the camera; Bridgewater's berries are farther away from the camera's eye. The two labels are not identical, nor are they nearly identical, and they employ different uses of lighting, focus, and positioning. As such, no reasonable person could conclude that the two Cranberry labels are "substantially similar" as that term has been defined.

### c. *Gardenia*

The two gardenia labels are perhaps the most similar of any of the sets of labels. Again, though, there are substantial dissimilarities. First, the companies' names appear in different places on the labels. Second, Yankee again uses much closer views of the plant, focusing on the white petals, and not the surrounding green leaves, while Bridgewater takes the more measured view, with a distanced photo of evenly-distributed petals and green and purple leaves. The two labels are not identical, nor are they nearly identical. They employ different uses of lighting, focus, and positioning. For these reasons, no reasonable person could conclude that the two Gardenia labels are "substantially similar" as that term has been defined.

### d. *Mulberry*

Again, there are substantial dissimilarities. First, Yankee's colors are markedly brighter than Bridgewater's. Second, Yankee intersperses among the berries a much greater quantity of leaves, while Bridgewater uses noticeably fewer. Third,

**2.** A "full-bleed" photograph is one in which there is no border or visual separation between the photograph and the perimeter of the label. Thus, in a full-bleed photograph, the subject in the photograph runs, or bleeds into the border of the label.

Yankee takes a much closer view of the berries, while Bridgewater hangs back. Given this, no reasonable person could conclude that the two Mulberry labels are "substantially similar" as that term has been defined.

### e. *Fresh Peach*

Again, there are substantial dissimilarities. First, Yankee uses peaches with a pinkish hue, and Bridgewater uses peaches that are more orange in color. Second, Yankee's label shows peaches that are whole, sliced in half, and cut in thin slices, whereas Bridgewater shows only whole and halved peaches. Third, Bridgewater calls its fragrance "Peach" and not "Fresh Peach." The two labels are not identical, nor are they nearly identical, and they employ different uses of lighting, focus, and positioning. No reasonable person could conclude that the two peach labels are "substantially similar" as that term has been defined.

### f. *Raspberry*

There are again substantial dissimilarities. First, Yankee's label shows many more leaves interspersed with the berries, and Bridgewater uses only a few. Second, Yankee shows fewer actual berries, while Bridgewater's label features many more, in an expansive view. Third, Bridgewater calls their fragrance "Raspberry Jubilee" as opposed to Yankee's "Raspberry." The two labels are not identical, nor are they nearly identical. They employ different uses of lighting, focus, and positioning. No reasonable person could conclude that the two Raspberry labels are "substantially similar" as that term has been defined.

### g. *French Vanilla*

█ While more than one way may exist to express the idea of vanilla, the ways are nevertheless very limited. Given this, "the burden of proof is heavy on the plaintiff who may have to show 'near identity' between the works at issue." *Concrete Machinery* 843 F.2d at 606. More-

over, as the court has already concluded, the use of an ice cream cone to depict vanilla is an example of "scene a faire" and is thus generally unprotectable. One glance at the parties' photographs reveals a most striking dissimilarity: Yankee's ice cream cones are empty, and Bridgewater's are full of what appears to be vanilla ice cream. This is such a blatant difference that it would be impossible for any reasonable observer to conclude that the two parties' expressions are "nearly identical." Because the subject matter portrayed is so markedly and obviously different, there is no need to engage in further side-by-side analysis of the photographs.

### h. *Cinnamon*

As with French Vanilla, there are only a limited number of ways to express the idea of cinnamon. Again, substantial dissimilarities are obvious and glaring. First, Yankee's label shows both cinnamon rolls and cinnamon sticks, while Bridgewater's shows only cinnamon rolls—in fact, the sticks in Yankee's label are displayed prominently and cannot be ignored. Second, Yankee's cinnamon rolls appear to have less frosting while Bridgewater's rolls are heavily frosted. Third, Bridgewater calls its fragrance "Cinnamon Rolls" as opposed to Yankee's simple name, "Cinnamon." The two labels are not identical, nor are they nearly identical. They employ different uses of lighting, focus, and positioning. No reasonable person could conclude that the two Cinnamon labels are "substantially similar" as that term has been defined.

### i. *Spiced Apple*

In much the same way, there are only a few ways to express the idea of apples, and apple-related subjects and, again, there are substantial dissimilarities. First, Yankee's label shows a slice of apple pie, the whole pie, a basket, and loose apples, while Bridgewater's label shows just whole pies and loose apples. Second, Yankee shows only red apples while Bridgewater shows

both red and green apples. Third, Bridgewater calls their fragrance "Apple Pie" as opposed to Yankee's name, "Spiced Apple"—arguably two very different ideas in and of themselves. Fourth, Yankee's photograph is strongly illuminated with a bright light shining from the left while Bridgewater's photograph is evenly lighted. The two labels are not identical, nor are they nearly identical. They employ different uses of lighting, focus, and positioning. No reasonable person could conclude that the two apple labels are "substantially similar" as that term has been defined.

In summary, a close (perhaps tediously close) examination of all the labels reveals that six of the nine labels in question contain expressions that completely merge with their subjects. The remaining three labels contain expressions that approach complete merger with their subjects and are sufficiently distinguishable from their Bridgewater counterparts that no ordinary observer could find them substantially similar based on the standards governing copyright claims regarding photographs and the doctrine of merger. It is important to note that all of the subjects expressed by both parties' labels are ordinary and everyday subjects. It is therefore understandable that they bear considerable likeness to each other. In situations in which the subject matter is so ordinary that an original expression would be difficult to imagine, the question the court must ask is, are the two photographs almost "perfectly identical?" *Pampered Chef,* 12 F.Supp.2d at 793. The indisputable fact that *none* of the Bridgewater photographs is remotely-identical to any of Yankee's depictions is crucially important. As the *Pampered Chef* court explained:

> [t]he fact that none of the photographs is identical is particularly important because both companies carry very similar lines of inventory.... [W]e must take into account that the photographs ... are often representations of identical,

fairly mundane objects and will necessarily bear a considerable amount of similarity to each other.

*See id.* at 792–93.

The court finds, as a matter of law, that Yankee Candle's copyrights for the nine labels at issue have not been infringed. A dissection of the copyrighted works makes it clear that the ideas depicted in the photographs merge with the expressions of those ideas; no reasonable factfinder, applying the "ordinary observer" test, could possibly conclude that the parties' photographs are "nearly identical." The use of lighting, focus, positioning and content of subject matter, and other factors of composition are all distinctive. None of these protectable elements has been infringed in any of the photographs at issue, nor could any ordinary observer find such infringement. Even viewing the facts in the light most favorable to Yankee, no juror could possibly conclude otherwise. For these reasons, the defendant's motion for summary judgment on the copyright claim will be allowed.

## B. *Trade Dress Claim*

Yankee's federal trademark claim falls under the Lanham Act, 15 U.S.C. § 1125(a) (1998), which gives the plaintiff a cause of action for the use by any person of "any symbol or device ... likely to cause confusion ... as to the origin ... of his or her goods." *Id.* This section of the Lanham Act has been held to include not only words and symbols, but also "trade dress," a category that includes both a product's packaging and its design and appearance. *See Wal–Mart Stores, Inc. v. Samara Brothers, Inc.,* —— U.S. ——, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000); *I.P. Lund Trading ApS, Kroin Inc. v. Kohler Co.,* 163 F.3d 27 (1st Cir.1998). Yankee claims Bridgewater has violated its trade dress in three distinct ways: by copying the overall "look and feel" of Yankee's Housewarmer line of candles; by copying

Yankee's vertical display system; and by copying the layout of Yankee's catalogue.[3]

The general purpose of trade dress protection is to "protect that which identifies a product's source." *I.P. Lund*, 163 F.3d at 35 citing *Qualitex Co. v. Jacobson Products Co.*, 514 U.S. 159, 162, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995). Trade dress protection under the Lanham Act provides a federal remedy "for the particular kind of unfair competition that results from false designation of origin or other false representation used in connection with the sale of a product." *Pampered Chef*, 12 F.Supp.2d at 793 (N.D.Ill.1998) quoting *Schwinn Bicycle v. Diversified Products Corp.*, 740 F.Supp. 517, 518–19 (N.D.Ill. 1990). In other words, the Lanham Act protects both producer and consumer from another's attempt to sell a product so similar that the consumer would think it the original. In essence, the Act protects the producer and the consumer from another's attempt to "pass off" an imposter product. At the heart of the Lanham Act's protection lies the potential for consumer confusion.

▮▮▮ To make out a claim under the Lanham Act, a plaintiff must prove the following elements: first, that the trade dress in question is used in commerce; second, that the alleged protected trade dress is nonfunctional; third, that the alleged protected trade dress is distinctive; and fourth, that another's use of a similar trade dress is likely to cause confusion. *See I.P. Lund*, 163 F.3d at 36. Neither party disputes that its candles are used in commerce; thus the first element is easily satisfied.

▮▮▮ Bridgewater argues that several aspects of Yankee's Housewarmer line are functional, and therefore cannot receive protection. As to a portion of the argument, the court is unpersuaded. The party alleging trademark infringement bears the burden of proving non-functionality.

Here, Yankee has sufficiently proved that the size, shape, and overall look and feel of their line are indeed nonfunctional as that word has been defined by the First Circuit. *See I.P. Lund*, 163 F.3d at 37 (explaining that a "functional product feature is one that is essential to the use or purpose of the article or [that] ... affects the cost or quality of the article." (Internal citations omitted)).

▮▮▮ There is nothing about the overall appearance of Yankee's "Housewarmer" line, or Yankee's catalogue, that is "essential to the use or purpose" of a candle, or a catalogue. Obviously, the candles have labels, and are housed in jars, but that is where any functionality ends. By the same token, Yankee's method of displaying one fragrance per page in its consumer catalogue, while perhaps esthetically pleasing, is not "functional" as that term has been construed in the case law.

▮▮▮ With respect to the vertical display system, however, Bridgewater's argument on functionality is much stronger. Yankee uses a wooden "hutch" to display its candles. The hutch is a unit of shelving that attractively holds rows of objects. Yankee hutches feature what it calls the "vertical display system" in which each column of candles is arranged by color, creating a visual rainbow of candles, sorted by like colors. Yankee claims Bridgewater has copied this display system, or trade dress. The visual arrangement of candles, on shelves, by color, is manifestly functional, and therefore not protectable under the Lanham Act.

First, one need only look to the nearest paint store, or towel show room to see that the display-by-color method is routinely used to show products that are color-intensive. Second, the fact that both Yankee and Bridgewater use similar wooden shelves is also indicative of the need, indeed the functionality, of such shelving to display properly small objects like can-

---

**3.** Yankee also charges copying of its "product line"; the discussion of this rather weak con- tention has been folded into the court's evaluation of the three other claims.

dles.[4] Yankee cannot invoke the Lanham Act to appropriate such a conventional method of presenting its wares. Because the court finds the vertical display system functional, it need not address this issue further.

In addition, Yankee cannot assert trade dress protection over the style and sizes of candles offered in its "Housewarmer" line. These merely reflect established consumer preferences or, as with votives, well rooted tradition.

The most vigorous dispute in this case is over whether Yankee's trade dress is distinctive and whether there is a likelihood of confusion between the two lines of products.

### 1. Distinctiveness

#### a. The Legal Terrain

In order to receive protection under the Lanham Act, a plaintiff must prove its product is distinctive. This can be done either by proving the product is "inherently distinctive" or proving the product has acquired "secondary meaning." *I.P. Lund*, 163 F.3d at 39. A mark is inherently distinctive if "its intrinsic nature serves to identify a particular source." *Wal–Mart*, —— U.S. at ——, 120 S.Ct. at 1343. A mark has acquired secondary meaning when "it has come through use to be uniquely associated with a particular source." RESTATEMENT (THIRD) OF UNFAIR COMPETITION, sec. 13, Comment (e).

In assessing a trademark's inherent distinctiveness, courts have usually applied the Second Circuit's *Abercrombie* test. *See Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4 (2d Cir.1976) (setting forth the five categories that make up the spectrum of inherent distinctiveness).

The *Abercrombie* test has been used in product packaging cases, but up to recently there has been some confusion over whether the Second Circuit's five categories should be used in product design, or product configuration cases. *See I.P. Lund*, 163 F.3d at 39 (citing cases that question "whether a product design can ever be inherently distinctive"). The Supreme Court's recent holding in *Wal–Mart Stores Inc. v. Samara Brothers, Inc.*, —— U.S. ——, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000), settled the issue with devastating effect on plaintiff's trade dress claim here.

▮ The difference between product packaging and product design/configuration is rather subtle, at first sight. What separates these two kinds of trade dress is each one's ability to identify its source. On the one hand, a product's name or package obviously and directly identifies its source. On the other hand, a product's design, or configuration, or simply the way that it appears, is primarily aesthetic and not source-identifying. As the Court explained in *Wal–Mart:*

> The attribution of inherent distinctiveness to certain categories of word marks and product packaging derives from the fact that the very purpose of attaching a particular word to a product, or encasing it in a distinctive package, is most often to identify the product's source. . . . With product design . . . consumers are aware of the reality that, almost invariably, that feature is intended not to identify the source, but to render the product itself more useful or more appealing.

*Id.* at 1341.[5] The *Wal–Mart* Court concluded that the *Abercrombie* test for inherent distinctiveness is inapplicable to claims

---

**4.** In *Yankee Candle Co., Inc. v. New England Candle Co., Inc.*, 14 F.Supp.2d 154, 163 (D.Mass.1998) vacated by settlement, the court found the wood shelving used by Yankee and its competitor to be a "bare necessity for displaying multi-colored candles."

**5.** The Court of Appeals for the Federal Circuit has said "[t]he public simply is not likely to associate origin immediately with the shape of goods. . . . In our economy, we expect similar products will come from a number of sources . . .". *In re DC Comics, Inc.*, 689 F.2d 1042, 1051 (Fed.Cir.1982) (Nies, J., concurring)

involving product design/configuration because, to repeat and distill, product design/configuration is almost never inherently source identifying. Indeed, the basis for the "inherently distinctive" category is the recognition that, while some words or marks are immediately and inherently indicative of source, and therefore distinctive, a product's design and configuration almost never are.

The different approaches to packaging and design claims do not, however, leave producers with a distinctive product design unprotected by the Lanham Act. *Wal–Mart* held that, although product designs/configurations cannot be deemed "inherently distinctive," they can nevertheless acquire secondary meaning over time. *See Wal–Mart,* —— U.S. at ——, 120 S.Ct. at 1346. Thus, it is possible for a product design to receive protection under the Lanham Act if a plaintiff proves the design has acquired secondary meaning over time to the extent that it has come to identify the source of the product. The question nevertheless remains: what is the plaintiff seeking to protect in this case, a package or a design? Although the parties have not addressed this question directly, it is clear that the "Housewarmer" line of candles (whether one focuses on the "look and feel" or the contents of the product line) and the catalogue layout both fall squarely in the "design/configuration" category of analysis. Put differently, Yankee's claims for protection do not relate to "word marks" or product packaging.

Because the *Wal–Mart* decision was not published until after oral argument, both parties have been caught somewhat off balance by the Court's dramatic clarification of trade dress doctrine. In its papers, Yankee argued forcefully that its "Housewarmer" line was, first and foremost, inherently distinctive. After *Wal–Mart,* the claim of "inherent distinctiveness" is no longer open to Yankee, since its trade dress claim relies on distinctive design and configuration not packaging. In short, the only way Yankee can receive protection for this product design is to prove secondary meaning.

### b. *Secondary Meaning*

Secondary meaning is an issue of fact; therefore, the court must determine, in a motion for summary judgment, whether a genuine issue of material fact exists with respect to secondary meaning. *See Volkswagenwerk Aktiengesellschaft v. Wheeler,* 814 F.2d 812, 816 (1st Cir.1987).

Secondary meaning, like inherent distinctiveness, has a rather fluid definition. To establish secondary meaning a plaintiff must show that, "in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself." *I.P. Lund,* 163 F.3d at 41–42 quoting *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.,* 456 U.S. 844, 851 n. 11, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982). At the historical root of the idea of secondary meaning is the common law tort of "passing off." *See Two Pesos Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 779, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992) (Stevens, J., concurring) (stating "[t]he ultimate offense always is that defendant has passed off his goods as and for those of the complainant." (internal citations omitted)). Thus, secondary meaning is directly tied to the product's life in the marketplace. *See* RESTATEMENT (THIRD) UNFAIR COMPETITION Sec. 13, Comment (e) (stating "secondary meaning exists only if a significant number of prospective purchasers understand the term when used in connection with a particular kind of good, service or business, not merely in its lexographic sense, but also as an indication of association with a particular, even if anonymous, entity.")

In order to prove a product has acquired secondary meaning, a plaintiff must make a vigorous evidentiary showing. *See Boston Beer Co. Ltd. Partnership v. Slesar Bros. Brewing Co., Inc.,* 9 F.3d 175, 181 (1st Cir.1993). Secondary meaning in product configuration cases will "generally

not be easy to establish." *Duraco Products Inc. v. Joy Plastic Enterprises, Ltd.,* 40 F.3d 1431, 1453 (3d Cir.1994). The preferred way to satisfy the stringent evidentiary requirements for secondary meaning is through consumer survey. *See Boston Beer,* 9 F.3d at 182 (stating "consumer surveys and testimony are the only direct evidence on this question"). In other words, the plaintiff must show that a "substantial portion" of the public, upon seeing a Yankee candle, would associate the product design or configuration with Yankee Candle Company. *See Labrador Software Inc. v. Lycos, Inc.,* 32 F.Supp.2d 31, 34 (D.Mass.1999). Yankee has offered no survey evidence in this case.

 In the absence of direct evidence, circumstantial evidence may be considered. The First Circuit instructs the district court to look for three factors in making the determination of whether secondary meaning has attached: "1) the length and manner of its use; 2) the nature and extent of advertising; and 3) the efforts made in the direction of promoting a conscious connection, in the public's mind between the trade dress and a particular product." *Boston Beer,* 9 F.3d at 182. Other factors can include the "product's established place in the market and proof of intentional copying." *I.P. Lund,* 163 F.3d at 42. The plaintiff, Yankee Candle, bears the burden of proving that secondary meaning has attached. *See Boston Beer,* 9 F.3d at 181. Application of these factors to the claimed areas of trade dress infringement establishes the absence of any disputed fact and clearly demonstrates that Yankee's trade dress has failed to achieve secondary meaning as a matter of law.

*i. "Housewarmer" Line*

Trademark law has long embraced the tenet that five years of continuous and exclusive use of a mark or trade dress generates a presumption of secondary meaning. *See* 15 U.S.C. § 1052(f) (1998).[6] In this case, it is undisputed that Yankee began marketing and selling its "Housewarmer" line of candles sometime in 1995 and filed suit against Bridgewater for trade dress infringement in November 1998. Yankee can, at best, only argue four years potential exclusive and continuous use.[7]

In order to prove that the public has made a conscious connection between Yankee's trade dress and its source, Yankee should be able to produce a history of what courts have called "look for" advertisements. A "look for" advertisement is one that specifically directs the consumer's attention to a particular aspect of a product, like a color, or shape of a container. *See Thomas & Betts Corp. v. Panduit Corp.,* 65 F.3d 654, 662 (7th Cir.1995); *International Jensen, Inc. v. Metrosound USA, Inc.,* 4 F.3d 819, 824 (9th Cir.1993). Yankee argues it has essentially created "look for" advertising, by virtue of the fact that it has advertised at all.

This argument will not wash. It is well established that the effort to promote a conscious connection between a trade dress and a source must be both more specific, and more concerted than mere advertising *per se.*[8] Yankee has pointed to *no* advertising emphasizing Housewarmer's design or configuration as a product identifier.

This brings the court to a separate but related issue. The "Housewarmer" line features the trademark "Housewarmer"

---

**6.** 15 U.S.C. 1052(f) has been held applicable to trade dress cases. *See Maple Grove Farms, Vt. v. Euro–Can Products, Inc.,* 974 F.Supp. 85, 94 (D.Mass.1997).

**7.** Yankee cites some exceptions to this five-year presumption but these decisions are either anomalous or inapplicable.

**8.** Ironically, Yankee has, in at least one line of advertisement, called upon the consumer to *ignore* the physical look of the product and be guided *only* by the name. The photograph in this ad actually blurs the appearance of the product and trumpets "What's in a name? Everything!"

and the source name "Yankee Candle" on every single candle. Yankee's advertising technique heavily emphasizes the company's name, and, relies almost exclusively on the Yankee name rather than on trade dress for consumer recognition. *See Maple Grove,* 974 F.Supp. at 94 citing *Ohio Art Co. v. Lewis Galoob Toys, Inc.,* 799 F.Supp. 870, 883 (N.D.Ill.1992) ("when words are used, there is even a higher burden to prove secondary meaning."); *Swisher Mower & Machine Co., Inc. v. Haban Manufacturing, Inc.,* 931 F.Supp. 645 (W.D.Mo.1996) (no secondary meaning where there is name visible); *Pampered Chef,* 12 F.Supp.2d at 795. It is flatly inconceivable that a consumer would associate the trade dress with Yankee, independent of the verbal encouragement that the Yankee and "Housewarmer" names provide. Yankee has provided absolutely *no* evidence to conclude otherwise. The court finds, then, that Yankee can point to no evidence of record demonstrating a significant connection between its asserted trade dress—i.e., its product design and configuration, whether reflected in the components of the product line or in the "look and feel" of its display—and the source of that trade dress.

Plaintiff's sales statistics and evidence of the nature and extent of its advertising do not support a contrary conclusion. Sales success by itself "will not be as probative of secondary meaning in a product configuration case ... since the product's market success may well be attributable to the desirability of the product configuration rather than the source-designating capacity of the supposedly distinguishing feature or combination of features." *Duraco Products,* 40 F.3d at 1452 (3d Cir.1994). In this case, Yankee has produced nothing to show that the high sales figures and extensive advertising accomplished anything more than simple promotion of an aesthetic product.

By the same token, confronting the final factors for consideration, Yankee's argument that Bridgewater intentionally copied its trade dress falls flat. In a product configuration case such as this one, intent, while a factor to be considered, plays a minor role. *See id.* at 1453 (stating "attempts to copy a product configuration will quite often not be probative: the copier may very well be exploiting a particularly desirable feature, rather than seeking to confuse consumers as to the source of the product"); *Leatherman Tool Group Inc. v. Cooper Industries, Inc.,* 199 F.3d 1009, 1013 (9th Cir.1999); *Pampered Chef,* 12 F.Supp.2d at 795 (intent must be to palm off, not to use ideas). Yankee's repeated citation of Bridgewater employees' occasional reference to the slogan "Yankee see Yankee do" thus provides no evidence of actual secondary meaning sufficient to avoid summary judgment.

Although Yankee did indeed hold an "established place in the market," this factor obviously cannot alone be sufficient to demonstrate secondary meaning attaching to its product's trade dress. To allow this would fly in the face of the purpose of the Lanham Act: to encourage competition while protecting manufacturers and the public against genuine attempts by others to pass off protected works as their own. The application of the other secondary meaning factors weigh so heavily against Yankee that there is no genuine issue of material fact to present to a jury.

Finally, it is worth noting the potentially problematic implications of a hybrid trademark/copyright case such as this one. It seems quite possible that overly aggressive claims to trade dress protection, such as those attempted by Yankee here, could easily invade the rights of properly copyrighted material. As such, "courts should proceed with caution in assessing claims to unregistered trade dress protection so as not to undermine the objectives of these other laws." *Jeffrey Milstein Inc. v. Greger, Lawlor, Roth, Inc.,* 58 F.3d 27, 32 (2d Cir.1995)

#### ii. *Catalogue*

█ The determination of whether Yankee's consumer catalogues have at-

tained secondary meaning follows the above analysis with one addition. Yankee claims Bridgewater copied its format of displaying one candle fragrance per page. Although courts have recognized that in some cases, the trade dress of catalogues may be protected under the Lanham Act, it must be emphasized that while "an owner of a trademark has a right to protect his reputation and good will, the paramount interest promoted by the Lanham Act is *the right of the public not to be confused about the origin of goods.*" *Pampered Chef,* 12 F.Supp.2d at 794 (emphasis supplied). Here, while Bridgewater has clearly made use of the same marketing tool Yankee uses to display its goods to consumers and wholesalers (one fragrance per page) there is no question that Bridgewater's catalogue is indeed Bridgewater's and not Yankee's. No fair minded person, looking at Bridgewater's document, could possibly view it as an attempt to "pass off" the Bridgewater catalogue as the Yankee one.

### 2. *Likelihood of Confusion*

Because the court has found that Yankee has failed to prove secondary meaning, Yankee's trade dress both in the "Housewarmer" line and its catalogue is not entitled to protection from the Lanham Act. Consequently, the court need not address the issue of likelihood of confusion, the last element necessary to establish protection under the Lanham Act. *See Boston Beer,* 9 F.3d at 183. A determination of likelihood of confusion generally involves an eight-step analysis and requires factual findings. Although it is not essential to the court's conclusion, if the court needed to decide the issue of likelihood of confusion, it would hold that no reasonable juror could conclude that there is a likelihood of confusion, where clearly marked company names are featured on the face of the products and catalogues. *See Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.,*

973 F.2d 1033, 1045 (2d Cir.1992) (holding "prominence of trade names ... weighs heavily against a finding of consumer confusion"); *Conopco Inc. v. May Dept. Stores,* 46 F.3d 1556, 1569 (Fed.Cir.1994). Similarly, in *Pampered Chef,* the court clearly stated

> [w]e also observe that Magic Kitchen's name clearly and unequivocally appears in large, bold font on the front of its catalogue (a name which does not appear to be confusingly similar to or a play on 'Pampered Chef'). This makes us seriously doubt whether it could be accused of attempting to 'palm off' its catalogue as Pampered Chef's or trying to confuse the public into thinking that the latter company was the origin of the two catalogues.

*Pampered Chef,* 12 F.Supp.2d at 795.

To summarize, the court concludes that because Yankee has failed to prove its "Housewarmer" and catalogue trade dress have acquired secondary meaning, it is not entitled to protection under the Lanham Act in these two areas as a matter of law. As noted, the vertical display system, and styles of candle, can receive no Lanham Act protection because they are functional.[9]

### C. *State Claims*

Yankee has asserted three state claims against Bridgewater: first, that Bridgewater has infringed Yankee's common law right to exclusive use of its trade dress; second that Bridgewater has tortiously interfered with Yankee's business relationships; and third, that Bridgewater has violated the Massachusetts Consumer Protection Act. Because the legal analysis is virtually identical for the common law trade dress claim, and in fact the parties have barely treated the issue independently of the federal claim, the motion for summary judgment on the common law

---

**9.** Because the court has found that no sufficient facts exist to support Yankee's trade dress claim on the merits, it is unnecessary to address Bridgewater's argument that it is entitled to summary judgment because Yankee has offered no evidence of damages.

trade dress claim will be allowed. As to one remaining, rather limited area, however, the motion will be denied as the record contains genuine issues of material fact.

 To make out a claim for tortious interference under Massachusetts law, Yankee must show that: 1) it had a contract with a third party; 2) Bridgewater knowingly induced the third party to break that contract; 3) the defendant's interference was improper in motive or means; and 4) Yankee was harmed by Bridgewater's actions. *Wright v. Shriners Hosp.*, 412 Mass. 469, 476, 589 N.E.2d 1241 (1992). Yankee has produced evidence, although minimal, in the form of affidavits, that Bridgewater falsely represented to a Yankee customer that Bridgewater had taken over the Yankee Company. Yankee claims this misrepresentation caused some customers to leave Yankee and move to Bridgewater. Thus, there has been enough evidence to support a claim for tortious interference with Yankee's business relationships.

With respect to Yankee's Ch. 93A claim, Bridgewater argues that the claim should be dismissed because Yankee has failed to show the actionable behavior to have been committed "primarily and substantially" within the Commonwealth. MASS.GEN.LAWS Ch. 93(A), sec. 11. According to the statute, however, the burden is actually on *Bridgewater* to prove that the behavior took place outside the Commonwealth. *See id.* While Bridgewater has alleged that only 4 percent of its business occurs in Massachusetts, this is not sufficient to permit summary judgment on the issue. The Ch. 93(A) claim, which is non-jury, will focus exclusively on the facts underlying Yankee's claim for tortious interference; the allowance of the motions for summary judgment on the copyright and Lanham Act claims disposes of those theories to the extent that plaintiff might otherwise offer those underlying facts as support for the Ch. 93(A) claim.

Both parties have moved to strike testimony of various experts and employees. (See Docket Nos. 95, 141, and 152) These motions are hereby denied as moot.

## IV. *CONCLUSION*

For the above reasons, defendant's motion for summary judgment on the copyright claim (Docket No. 78) is ALLOWED; defendant's motion for summary judgment on the federal and common law trade dress claims (Docket No. 130) is ALLOWED; defendant's motion for summary judgment on the tortious interference and Chapter 93A claims (Docket Nos. 134) is DENIED.

The motions to strike are denied as moot, as noted.

A separate order will issue.