Janet G. STANTON, et al., Plaintiffs,

v.

SOUTHERN BERKSHIRE REGIONAL SCHOOL DISTRICT, et al., Defendants.

Civil Action No. 96–30115–MAP.

United States District Court, D. Massachusetts.

Nov. 19, 1998.

Alan J. Rom, Law Office of Sherwin L. Kantrovitz, Boston, MA, for Janet G. Stanton, David Macy, Richard Kirchner, Town of Sheffield, Robert A. Weitz, David Steindler, Judith Steindler, Anthony Gulotta, Louis Caputzal, Lisa Caputzal, Ralph Philip Macy, James McGarry, Antonio Malnati, Charles Joch.

James M. Lamme, III, Lamme, Linscott & Flournoy, Great Barrington, MA, Katherine G. Alexander, City Solicitor's Office, Pittsfield, MA, for Southern Berkshire Regional School District

Katherine G. Alexander, Pittsfield, MA, for Mary White, John Pollitt, Carolyn Ullrich, Arthur Battachi, Robert Vandeusen, Lucy Prashker, Susan Engel, Jed Lipsky, David Ornstil, Robert Marcel.

Charles J. Ferris, Great Barrington, MA, for Town of Egremont, James Vandeusen, Michael Harrigan, Charles Flynn.

Lori H. Levinson, John F. Rogers, Cain, Hibbard, Myers & Cook, Pittsfield, MA, for Town of Alford, Clyde Brown, Charles F. Ketchen, Raymond E. Wilcox, Jr.

## ORDER

PONSOR, District Judge.

For the reasons stated in the accompanying Memorandum, plaintiffs' Motion for Attorney's Fees and Costs is hereby DENIED. If a reviewing court should determine on appeal that plaintiffs were entitled to attorney's fees and costs, however, this court cal-

culates the amount to which plaintiffs would be entitled as $15,533.33 in fees and $548.00 in costs.

## MEMORANDUM REGARDING PLAINTIFFS' MOTION FOR ATTORNEY'S FEES AND COSTS

### I. INTRODUCTION

Plaintiffs challenged the Southern Berkshire Regional School District ("SBRSD") election scheme under 42 U.S.C. § 1983, alleging that it violated the "one person, one vote" mandate of the Fourteenth Amendment and that the Town of Sheffield's voters were underrepresented on the regional school committee. Allowing an essentially uncontested motion for summary judgment, this court declared that the election scheme was in fact unconstitutional. The parties then turned to the question of the appropriate remedy. After lengthy negotiations, they agreed upon a system under which representatives to the school committee will be appointed rather than elected. Sheffield's voting power on the committee, however, will not change.

Plaintiffs now seek attorney's fees and costs as the prevailing party under 42 U.S.C. § 1988. This court must determine (1) if plaintiffs are the prevailing party, and if so (2) the amount of fees and costs to which they are entitled. For the reasons set forth below, plaintiffs motion will be denied.

### II. FACTS

Plaintiffs in this action include Sheffield residents and members of the Sheffield Board of Selectmen. Defendants include members of the SBRSD school committee and the selectmen of the other SBRSD towns.

In 1953, the towns of Sheffield, Egremont, New Marlborough, and Monterey entered into an agreement to form the SBRSD. Alford joined the school district in 1954. The agreement provided that the school committee would be comprised of ten members, with Sheffield voters electing four members, Egremont and New Marlborough voters electing two each, and Monterey and Alford voters each electing one. Each member of the committee was to cast an equally weighted vote. Thus, Sheffield's four committee members together controlled forty percent of the committee's voting strength.

In 1986, the First Circuit held that the Fourteenth Amendment's "one person, one vote" principle applied to elected regional school committees. *See Kelleher v. Southeastern Regional Vocational Technical High Sch. Dist.,* 806 F.2d 9, 13 (1st Cir.1986). Under this ruling, regional school district election schemes that failed to apportion school committee representation according to population were held to deprive "voters of the constitutional right to cast an equally weighted vote." *Id.* The court noted that several remedial options were available to regional school districts, including "appointing Committee members by locally elected officials." *Id.* at 13 n. 17. Shortly after the First Circuit decided *Kelleher,* the Massachusetts Secretary of State issued a memorandum to regional school districts, explaining the decision and briefly outlining ways in which school districts could comply with it.

By the 1990s, Sheffield had more than 45% of the SBRSD's population, while Egremont and New Marlborough had approximately 17–18% each, Monterey 12%, and Alford about 6%. The towns recognized that their elective scheme was unconstitutional; in particular, Sheffield's voters were underrepresented on the school committee. Hoping to solve this problem, the school committee established a subcommittee to devise a voting scheme that would be both constitutional and acceptable to all five towns. Despite their considerable efforts over the course of several years, the towns were unable to agree upon a remedy. In 1996, plaintiffs filed suit, claiming that the apportionment scheme diluted the voting strength of Sheffield's voters.

As early as November 1996, plaintiffs began advocating a weighted voting scheme under which the relative weights of committee members' votes would be adjusted according to the populations of the towns. The other towns were not receptive to this approach. In July 1997, defendant Egremont proposed an appointive system that would maintain the structure of the committee and

the number of votes assigned to each town, but would change the process by which representatives were selected. Under this proposal, each town would appoint, rather than elect, its committee members. Plaintiffs rejected this proposal.

Later in July 1997, this court allowed plaintiffs' unopposed motion for summary judgment and declared the school district's voting scheme unconstitutional.[1] As noted above, during the whole history of the dispute all the towns conceded that the voting scheme was unconstitutional under *Kelleher*. After allowing the motion, the court urged the parties to press forward vigorously with their negotiations towards a constitutional remedy acceptable to the citizens of all five towns.

Ultimately, the parties did settle their dispute. The resolution bears a strong resemblance to Egremont's July 1997 proposal. Under the terms of the agreement, the selectmen of each town will appoint that town's representatives to the school committee. The composition of the committee will not change; Sheffield will continue to be represented by four of the ten committee members, and these four members will continue to have forty percent of the committee's voting power. Similarly, the other towns will retain the same number of votes and the same voting power. The only difference between the new and old schemes is that each town will appoint, rather than elect, its representatives. Although it will have no effect on the proportional representation of each town on the school committee, this resolution of the problem passes constitutional muster. *See Kelleher*, 806 F.2d at 13 n. 17.

## III. *DISCUSSION*

### A. *Prevailing Party Analysis*

Plaintiffs now seek attorney's fees and costs under 42 U.S.C. § 1988. Section 1988(b) provides that in an action to enforce a provision of 42 U.S.C. § 1983, "the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable

attorney's fee as part of the costs." Thus, plaintiffs are entitled to attorney's fees under this provision only if they prevail in litigation. The Supreme Court articulated the standard for determining whether a plaintiff is a prevailing party for purposes of § 1988 in *Farrar v. Hobby*:

> Therefore, to qualify as a prevailing party, a civil rights plaintiff must obtain at least some relief on the merits of his claim. The plaintiff must obtain an enforceable judgment against the defendant from whom fees are sought, or comparable relief through a consent decree or settlement. Whatever relief the plaintiff secures must directly benefit him at the time of the judgment or settlement. Otherwise the judgment or settlement cannot be said to "affec[t] the behavior of the defendant toward the plaintiff." Only under these circumstances can civil rights litigation effect "the material alteration of the legal relationship of the parties" and thereby transform the plaintiff into a prevailing party. *In short, a plaintiff "prevails" when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff.*

506 U.S. 103, 111–12, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992) (citations omitted) (emphasis added).

■ Additionally, the First Circuit recognizes the "catalyst test," under which plaintiffs are viewed as prevailing parties if they prompt defendants to take action to meet their claims or provoke relief, even if they do not obtain favorable final judgment on the merits. *See Langton v. Johnston*, 928 F.2d 1206, 1224 (1st Cir.1991). This theory remains viable after *Farrar*. *See McLaughlin v. Boston Sch. Comm.*, 976 F.Supp. 53, 59 (D.Mass.1997).

■ Plaintiffs have not prevailed on their claim that Sheffield's voters are underrepresented on the regional school committee. The new appointive system does not provide

---

**1.** Although defendants questioned the necessity of summary judgment, they did not dispute that the voting scheme was unconstitutional.

Sheffield's voters with a greater share of the voting power. Sheffield will continue to be represented by four school committee members, and their four votes will still constitute forty percent of the committee's voting strength. Thus, the disproportionality between Sheffield's population and the weight of its votes, which was the cornerstone of plaintiffs' complaint, persists. Ironically, if the settlement has accomplished anything for Sheffield's voters, it has been to take the selection of school committee representatives out of their hands. It would be paradoxical, indeed, to say that plaintiffs have prevailed on their voting rights claim by depriving voters of the ability to vote and by preserving Sheffield's underrepresentation on the school committee.

At the hearing on this motion for attorney's fees, plaintiffs repeatedly explained that the appointive system will benefit Sheffield's *selectmen* politically, to the extent that they will now be able to appoint school committee members whose views they favor. As their argument goes, school committee members appointed by the selectmen are more likely than elected members to cast votes consistent with the selectmen's views. This prediction may or may not prove true. But even if the selectmen have secured a political advantage in this respect, such an ancillary boon is not the kind of benefit contemplated by the *Farrar* prevailing party analysis. Increased political control for the selectmen simply does not constitute relief on plaintiffs' claim that Sheffield's voters are underrepresented on the regional school committee. Because the agreement does nothing to rectify the dilution of Sheffield's voting strength on the school committee, it does not directly benefit plaintiffs on the merits of their claim. *See Farrar,* 506 U.S. at 111–12, 113 S.Ct. 566.

Furthermore, the appointive system `to which the parties have agreed in no way resembles the weighted voting system or any of the other remedies sought by plaintiffs throughout this litigation. *See Strickland v. Lamar County Bd. of Comm'rs,* 807 F.Supp. 121, 124 (M.D.Ga.1992) (holding that plaintiffs did not prevail for several reasons, including that "plaintiffs did not even obtain

the relief . . . that they requested"), *aff'd,* 14 F.3d 59 (11th Cir.1994) (table). Indeed, plaintiffs expressly rejected the idea of an appointive system during the course of litigation. On July 16, 1997, defendant Town of Egremont proposed an appointive system in a letter circulated to school committee members. When Egremont reported this proposal at a July 25, 1997 hearing, plaintiffs rejected it out of hand. In a brief to the court several months later, plaintiffs explained why this approach would be unsatisfactory:

> It was only at the last hearing when Egremont defendants advanced the argument that an appointive system might be used. They seem quick to take Sheffield's citizens' right to vote away, and plaintiffs responded by offering Egremont the opportunity to appoint its representatives if it so desires but that Sheffield's citizens should not have to give up their right to vote because Egremont's citizens want to appoint their representatives. It is the equalized voting power on the school committee that concerns plaintiffs. It would be a Pyrrhic victory, indeed, if, after all was said and done, the current reality continued to exist by another name. The crucial fact ·militating against either the appointive or residency requirement, is that the current composition and weights of those votes do not change to stay relative to population changes.

Plaintiffs' Memorandum, Docket No. 83 at 17–18. Plaintiffs further stated: "If the Court selects an appointive remedy, plaintiffs urge that the number to be appointed from each town be modified to represent the population distribution." *Id.* at 20.

In other words, when faced with a proposed appointive system, plaintiffs recognized its substantial shortcomings and claimed that it would merely represent "the current reality . . . by another name." Plaintiffs emphasized that their fundamental concern was "equalized voting power." In the end, of course, an appointive system more or less identical to the one proposed by Egremont *was* agreed upon. This system does not apportion votes according to population. Thus, plaintiffs have failed to achieve their goal of equalized voting power.

■ Finally, contending that "it took the filing of this lawsuit to vindicate plaintiffs' rights," plaintiffs invoke the catalyst test. (Docket No. 134 at 10) "The catalyst test 'applies to plaintiffs who have succeeded in achieving favorable results because of the filing of their § 1983 claim, but have not had a final judgment on the merits entered in their favor.'" *Langton v. Johnston,* 928 F.2d 1206, 1224 (1st Cir.1991) (quoting *Exeter–West Greenwich Regional Sch. Dist. v. Pontarelli,* 788 F.2d 47, 52 (1st Cir.1986). For the reasons discussed above, however, plaintiffs have not achieved favorable results in this litigation. Moreover, given that the parties were engaged in serious efforts to develop a selection method before this lawsuit was filed, the stronger evidence is that plaintiffs' suit had no catalytic effect. The catalyst test therefore does not apply to this case.

In sum, the court concludes that plaintiffs were not the prevailing party in this litigation for purposes of 42 U.S.C. § 1988. Plaintiffs' motion for fees and costs will therefore be denied.

## B. *Fee Calculation*

Because a reviewing court might disagree with this court's holding and determine on appeal that plaintiffs were entitled to attorney's fees and costs under § 1988, this court will address the reasonableness of the fees sought by plaintiffs.

Plaintiffs seek $68,179.69 in attorney's fees, which represents approximately 270 hours of work by an attorney at $250.00 an hour and fifteen hours of work by a law student at $60.00 an hour.[2] Plaintiffs also seek reimbursement of $719.00 in costs.

■ The first step in setting a fee award is to establish a "lodestar" by multiplying the total number of hours reasonably spent by a reasonable hourly rate. *See Grendel's Den, Inc. v. Larkin,* 749 F.2d 945, 950 (1st Cir. 1984). A reasonable hourly rate is calculated by considering "such factors as the type of work performed, who performed it, the expertise that it required, and when it was undertaken." *Id.* at 951. A reasonable fee must be "calculated according to the prevail-

ing market rates in the relevant community." *Blum v. Stenson,* 465 U.S. 886, 895, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). "To determine the number of hours reasonably spent, one must first determine the number of hours actually spent and then subtract from that figure hours which were duplicative, unproductive, excessive, or otherwise unnecessary." *Grendel's Den,* 749 F.2d at 950. Once this lodestar figure is calculated, a court may adjust the award upward or downward to reflect other factors, including the result obtained. *See id.* at 951.

Defendants attack both the hourly rate and the total number of hours sought by plaintiffs. First, they challenge counsel's hourly rate of $250.00. In support of their argument, defendants point to several affidavits from Berkshire County attorneys stating that prevailing rates in Berkshire County during the period of this litigation were somewhere in the range of $125.00 to $200.00 an hour for experienced attorneys. Defendants urge the court to recognize that rates in western Massachusetts generally, and Berkshire County in particular, are lower than those in eastern Massachusetts, where plaintiffs' counsel practices.

Plaintiffs, on the other hand, submit affidavits stating that $250.00 is a reasonable hourly rate for someone of counsel's experience and knowledge. Plaintiffs' counsel has been a member of the Massachusetts Bar for twenty years. He has worked on numerous voting rights cases in federal court and contends that it was precisely because of his extensive experience that plaintiffs employed him.

■ Plaintiffs' view is persuasive. Affidavits support the $250.00 hourly rate, and other courts in this district have made comparable awards. *See Williams v. Hanover Hous. Auth.,* No. 93–10964–WGY at 9 (D.Mass. Aug. 19, 1997) (holding that $250.00 an hour is reasonable rate for expert attorney); *McMillan v. Massachusetts Soc'y for the Prevention of Cruelty to Animals,* No. 92–11178–RGS at 4 (D.Mass. Nov. 12, 1996) (holding that $285.00 an hour is reasonable rate for senior attorney). Furthermore,

---

**2.** A small amount of "non-core" work was performed by counsel at a reduced hourly rate.

counsel's extensive background may have enabled him to handle the case in a shorter amount of time than another lawyer without comparable experience. *See Planned Parenthood, Sioux Falls Clinic v. Miller,* 70 F.3d 517, 519 (8th Cir.1995). Though prevailing rates in Berkshire County may be somewhat lower than in other parts of the state, in light of counsel's experience and particularized knowledge of voting rights cases, this court is satisfied that $250.00 represents a reasonable hourly rate. *See McDonald v. Armontrout,* 860 F.2d 1456, 1460–61 (8th Cir.1988) (observing that "attorneys in rural areas frequently command lower fees than attorneys in urban areas," but nonetheless awarding higher fee in light of counsel's skill, experience, and reputation); *Schultz v. Amick,* 955 F.Supp. 1087, 1114 (N.D.Iowa 1997) (finding that relevant community could reasonably be construed as the entire state of Iowa, not just Sioux City).

As a secondary attack on counsel's hourly rate, defendants argue that counsel is not entitled to reimbursement at his full hourly rate for travel time. At the hearing on this motion, plaintiffs' counsel conceded that his rate could fairly be adjusted downward for hours spent traveling. Accordingly, this court concludes that a reasonable rate for plaintiffs' counsel's travel time is $100.00 an hour. *See Furtado v. Bishop,* 635 F.2d 915, 922 (1st Cir.1980) ("[W]e are disinclined to compensate an attorney at professional rates for travel time.").

Defendants also contest the number of hours billed by plaintiffs' counsel. Specifically, they argue that plaintiffs' counsel is not entitled to fees for any work done after July 16, 1997, the date that defendant Egremont proposed an appointive system for selecting school committee members. This court agrees. Because the parties ultimately agreed upon exactly such a solution to their dispute, with no more than minimal modification, the hours spent after July 16, 1997 were unnecessary. *See Grendel's Den,* 749 F.2d at 950. The number of hours reasonably spent will therefore only include hours worked before July 16, 1997.

Using the time sheets submitted by plaintiffs' counsel, it appears that plaintiffs' counsel spent 77 hours of non-travel time and 40.5 hours of travel time working on the case before July 16, 1997. Seventy-seven hours multiplied by $250.00 an hour yields a product of $19,250.00. Forty and a half hours multiplied by $100.00 an hour yields a product of $4,050.00. The sum of these figures is $23,300.00.

Having reached this lodestar amount, the next step in the analysis is to consider whether any factors warrant adjusting the figure. *See Grendel's Den,* 749 F.2d at 951. "A preeminent consideration in the fee-adjustment process is the results obtained by the plaintiffs." *Guckenberger v. Boston Univ.,* 8 F.Supp.2d 91, 108–09 (D.Mass.1998) (citations and quotations omitted); *see also Hensley v. Eckerhart,* 461 U.S. 424, 435–36, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). The First Circuit considers three meanings of the term "results obtained": plaintiffs' success on each claim, relief actually achieved, and the societal importance of the right which has been vindicated. *See Guckenberger,* 8 F.Supp.2d at 109 (quoting *Coutin v. Young & Rubicam Puerto Rico, Inc.,* 124 F.3d 331, 338 (1st Cir.1997)).

In this case, plaintiffs achieved, at the most, only very limited success; as discussed above, the resolution of this voting rights dispute resulted in depriving Sheffield's voters of the right to vote. The agreement between the parties has done nothing to rectify Sheffield's underrepresentation on the regional school committee. Moreover, plaintiffs were unsuccessful in implementing the weighted voting system they proposed. In short, the settlement of the case was, in plaintiffs' terms, "a pyrrhic victory." Accordingly, the lodestar amount should be reduced by one-third to $15,533.33. *See Pearson v. Fair,* 980 F.2d 37, 46 & n. 16 (1st Cir.1992) (reducing fee award by 85% in light of plaintiffs' limited success).

Finally, plaintiffs seek $719.00 in costs, which includes the $120.00 filing fee, $428.00 in copying costs, and $171.00 for the transcript of a February 1998 hearing. Section 1988 allows for the recovery of "those out-of-pocket expenses that would normally

be charged to a fee paying client." *Harris v. Marhoefer,* 24 F.3d 16, 19 (9th Cir.1994) (quotation omitted); *Cleveland Area Bd. of Realtors v. City of Euclid,* 965 F.Supp. 1017, 1023 (N.D.Ohio 1997); *Gay Lesbian Bisexual Alliance v. Sessions,* 930 F.Supp. 1492, 1498 (M.D.Ala.1996). The transcription costs were incurred after July 16, 1997; for the reasons discussed above, they should not be awarded. Otherwise, plaintiffs' request for the remaining $548.00 in costs is reasonable.

### IV. *CONCLUSION*

Because plaintiffs did not prevail in this litigation, they are not entitled to recover attorney's fees and costs under 42 U.S.C. § 1988. Accordingly, plaintiffs' motion for fees and costs is denied. If a reviewing court should determine on appeal that plaintiffs were entitled to attorney's fees and costs, however, this court calculates the amount to which plaintiffs would be entitled as $15,-533.33 in fees and $548.00 in costs.

A separate order will issue.