The YANKEE CANDLE COMPANY, INC., Plaintiff,

v.

The BRIDGEWATER CANDLE COMPANY, LLC, Defendant

Civil Action No. 98–30226–MAP.

United States District Court, D. Massachusetts.

May 14, 2001.

Mary R. Bonzagni, Law Offices of Donald S. Holland, Longmeadow, MA, Donald S. Holland, Holland & Bonzagni, P.C., Longmeadow, MA, Gregory L. Baker, Colin Foley, Howrey Simon Arnold & White, Washington, DC, Cecil E. Key, Jr., Brobeck Pheger & Harrison, Washington, DC, for Plaintiff.

Jeffrey M. Karmilovich, Richard M. Moose, Dority & Manning, Greenville, SC, Michael A. Albert, Wolf, Greenfield & Sacks, Boston, MA, for Defendants.

Kathleen A. Linert, Morrison, Mahoney & Miller, Boston, MA, for movant.

## MEMORANDUM REGARDING DEFENDANT'S MOTION TO RECOVER ATTORNEYS' FEES AND COSTS

(Docket No. 189)

PONSOR, District Judge.

### I. INTRODUCTION

The defendant, Bridgewater Candle Company, ("Bridgewater") has moved for attorneys' fees and costs against plaintiff Yankee Candle Company ("Yankee"). Yankee brought claims under the Copyright Act, the Lanham Act and Mass. Gen. Laws ch. 93A, as well as a common law claim of tortious interference with business relationships, regarding its "Housewarmer" line of scented candles. Summary Judgment was entered in favor of Bridgewater on the copyright and trade dress claims on June 8, 2000, and on the Chapter 93A claim on July 27, 2000. These rulings are now before the First Circuit Court of Appeals.

The court will allow most of the fees and costs defendant seeks in this case. Yankee Candle's pursuit of this litigation has served not to defend any colorable copyright or trade dress claim, but to intimi-

date, discourage and financially damage an upstart competitor. Awarding fees will serve the purposes of the statutes, and is fair and reasonable under the circumstances.

## II. BACKGROUND

Yankee Candle's 26–page complaint asserts copyright and trade dress infringement of its "Housewarmer" line of jarred, scented candles. The candles, which have scents including Eucalyptus, Cranberry, Gardenia and French Vanilla, carry labels with photographs depicting the particular scent of each candle. Bridgewater's candles have similar scents, and also feature photographic labels. Yankee alleged that Bridgewater intentionally infringed the copyrighted labels and trade dress of the "Housewarmer" line, resulting in consumer confusion. Specifically, it charged that Bridgewater's labels were so similar to Yankee's copyrighted labels as to be nearly identical, and that Bridgewater had infringed Yankee's trade dress in the overall "look and feel" of its candles, the design of its catalogue, and the use of a "vertical display system" for showing candles in stores. Yankee also alleged common law trade dress infringement, tortious interference with business relationships, and violation of Mass. Gen. Laws ch. 93A.

On May 18, 1999, the court denied Yankee's request for a preliminary injunction, finding that it was unlikely to prevail on the merits. After contentious discovery, the case reached summary judgment on all counts. The court allowed summary judgment on the copyright and Lanham Act claims, ruling that no reasonable juror could find the labels on the candles to be nearly identical, and that each element of alleged trade dress infringement was either not protectable or not likely to cause consumer confusion about the origin of the goods.[1]

Summary judgment was denied as to the tortious interference and Chapter 93A counts because Yankee had produced some evidence, "although minimal," of actionable conduct. *Yankee Candle Co., Inc. v. Bridgewater Candle Co., Inc.,* 99 F.Supp.2d 140, 157 (D.Mass.2000). According to affidavits, Bridgewater had falsely represented to a Yankee customer that it had taken over Yankee, resulting in some customers leaving Yankee and moving to Bridgewater. *See id.* A dispute remained, however, whether this actionable conduct had been committed "primarily and substantially" within Massachusetts for the purposes of Mass. Gen. Laws ch. 93A. On a motion for reconsideration, the court held that it had not, thereby eliminating the Chapter 93A claim. Only the tortious interference count survived, and this portion of the case was dismissed by agreement pending the outcome of Yankee's appeal.

As noted, appeal on the merits is now pending, but this court has retained jurisdiction over Bridgewater's motion for attorneys' fees under the Copyright and Lanham Acts.

## III. DISCUSSION

### A. Attorneys' Fees Under the Copyright Act

■ Defendant seeks attorneys' fees under § 505 of the Copyright Act, which allows the court in its discretion to award costs and "a reasonable attorney's fee" to "the prevailing party" in a copyright case. 17 U.S.C. § 505 (1996). Unlike many fee statutes, the Copyright Act requires courts

---

1. This ruling also eliminated the common law trade dress claim, the analysis of which was nearly identical to that of the Lanham Act. *See* *Yankee Candle Co., Inc. v. Bridgewater Candle Co., Inc.,* 99 F.Supp.2d 140, 156–57 (D.Mass. 2000).

to exercise their discretion in favor of prevailing plaintiffs and prevailing defendants in an evenhanded manner. *See Fogerty v. Fantasy, Inc.,* 510 U.S. 517, 534, 114 S.Ct. 1023, 127 L.Ed.2d 455 (1994) (holding that under the Act, "[p]revailing plaintiffs and prevailing defendants are to be treated alike, but attorney's fees are to be awarded to prevailing parties only as a matter of the court's discretion"). There are no rigid standards to guide the court's discretion in copyright cases, but certain equitable factors must be addressed. They include "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in some cases to advance considerations of compensation and deterrence." *Id.* at 534 n. 19, 114 S.Ct. 1023, *quoting Lieb v. Topstone Indus., Inc.,* 788 F.2d 151, 156 (3d Cir.1986); *see also Lotus Dev. Corp. v. Borland Intern., Inc.,* 140 F.3d 70, 73 (1st Cir.1998). The Court has cautioned that these factors may be used only so long as they are faithful to the purposes of the Copyright Act, that is, to encourage "the production of original literary, artistic, and musical expression for the good of the public." [2] *Fogerty,* 510 U.S. at 524, 114 S.Ct. 1023.

An award of attorneys' fees in this case is fully supported by the factors courts must consider in copyright cases, as well as the purposes of the Copyright Act. The court will treat each consideration in turn.

### 1. Equitable Factors.

#### a. Objective Unreasonableness.

The First Circuit has accorded the factor of "objective unreasonableness" substantial weight in the determination of whether to award attorneys' fees. *See Lotus,* 140 F.3d at 74 (affirming denial of fees because copyright holder's claims "were neither frivolous nor objectively unreasonable").[3] To determine objective unreasonableness, a court must examine the factual and legal assertions advanced by the nonprevailing party and determine whether they were reasonable. An unreasonable claim need not be frivolous to be compensable, *Matthews v. Freedman,* 157 F.3d 25, 29 (1st Cir.1998), nor does a finding of

---

**2.** Bridgewater, relying largely on pre-*Fogerty* decisions, suggests that fees should be granted "as a matter of course" or "routinely" in favor of prevailing defendants. *See Micromanipulator Co., Inc. v. Bough,* 779 F.2d 255, 259 (5th Cir.1985). The Court's opinion in *Fogerty,* however, casts a pall over this argument: the Court expressly refused to import the "British rule," that fees should be awarded "as a matter of course, absent exceptional circumstances," into the Copyright Act. *Fogerty,* 510 U.S. at 533, 114 S.Ct. 1023. Other courts have similarly read *Fogerty* to mean "that fees should not be awarded as a matter of course, but in light of various equitable factors, keeping in mind the purpose of the Copyright Act...." *FASA Corp. v. Playmates Toys, Inc.,* 1 F.Supp.2d 859, 862 (N.D.Ill. 1998). On the other hand, one Court of Appeals has held that *Fogerty* does not interfere with its own standard: that fee awards are "discretionary but routinely awarded." *See Hogan Sys. v. Cybresource Int'l, Inc.,* 158 F.3d 319, 325 (5th Cir.1998). Though there may be a semantic distinction between "as a matter of course" and "discretionary but routinely awarded," the Supreme Court's simpler formulation seems preferable: fees will be awarded as a matter of the court's discretion. *See Fogerty,* 510 U.S. at 534, 114 S.Ct. 1023.

**3.** Several other Circuits have also found objective reasonableness to be a significant factor. *See Harris Custom Builders Inc. v. Hoffmeyer,* 140 F.3d 728, 730–31 (7th Cir.1998) (vacating award of fees because, *inter alia,* losing party's claims were objectively reasonable); *Maljack Prods., Inc. v. GoodTimes Home Video Corp.,* 81 F.3d 881, 890 (9th Cir.1996) (awarding fees because, *inter alia,* plaintiff's claims were "factually unreasonable"); *Diamond Star Bldg. Corp. v. Freed,* 30 F.3d 503, 506 (4th Cir.1994) (affirming award of fees because, *inter alia,* "the objective reasonableness factor strongly weighs in favor of awarding attorney's fees and costs").

unreasonableness imply culpability on the part of the losing party, as with Fed. R.Civ.P. 11. "Had Congress intended to condition the award of fees on the presence of bad faith, the statutory provision would have been surplusage." *Lieb*, 788 F.2d at 155. Indeed, unreasonableness is not even a requirement of a fee award. "Depending on other circumstances, a district court could conclude that the losing party should pay even if all of the arguments it made were reasonable." *Matthews*, 157 F.3d at 29.

Taking Yankee's copyright claim in its totality, the court finds that it was objectively unreasonable, especially as to its factual underpinnings. At both the preliminary injunction and summary judgment stages, the court noted the marked weakness of Yankee's claim that the photographs on the labels were "identical," or even nearly so. *See Yankee Candle*, 99 F.Supp.2d at 148–50 (ruling for Bridgewater on every allegation of copyright infringement). There were substantial dissimilarities between Bridgewater's labels and each of its Yankee analogues. The labels employed different uses of lighting, focus, color and positioning; the companies' names appeared in different places on the labels; they sometimes even depicted different subjects.[4] No reasonable juror acting as an ordinary observer could have found the photographs to be substantially similar. Plaintiff's choice to bring such a factually weak claim, frivolous or not, is a relevant consideration in the determination of whether to award attorneys' fees. *See Matthews*, 157 F.3d at 29.

### b. *Motivation.*

Another factor the Court has emphasized is the plaintiff's motivation in bringing the suit. *Fogerty*, 510 U.S. at 534 n. 19, 114 S.Ct. 1023. Should it appear that plaintiff's motivation was not a good faith intent to protect a valid interest, but rather a desire to discourage and financially damage a competitor by forcing it into costly litigation, an award of fees is more likely. *See NLFC, Inc. v. Devcom Mid–America, Inc.*, 916 F.Supp. 751, 759–60 (N.D.Ill.1996) (awarding fees partly because suit motivated by bad faith attempt to harm competitor).

There is some evidence of anti-competitive motivation in Yankee's prosecution of this suit. This case was filed without notice to Bridgewater and without any meaningful pre-litigation attempt to resolve the companies' differences. The claim was not brought in an unsettled area of law, nor did it ever have a reasonable likelihood of success, as the court held early on in its denial of plaintiff's motion for a preliminary injunction. Yet Yankee appeared determined to make the litigation as damaging as possible for Bridgewater's business. In a particularly revealing instance, Yankee scheduled depositions for Bridgewater marketing personnel on the exact day of an important candle trade show, a conflict of which Yankee had previously been informed. When reminded of the conflict, Yankee's counsel did not respond by rescheduling. Rather, in a series of letters remarkable for their snide and unprofessional tone,[5] Yankee's counsel threatened

---

**4.** *See Yankee Candle*, 99 F.Supp.2d at 149 (noting that label for Yankee's "Cinnamon" Housewarmer candle featured prominent cinnamon stick, while Bridgewater's "Cinnamon Roll" candle showed only cinnamon rolls).

**5.** *See* Fourth Affidavit of Ilan D. Barzilay, Docket No. 200, Ex. A, (Correspondence between Attorney Michael A. Albert and Gregory L. Baker, August, 1999). After Gregory Baker, Yankee's counsel, noticed depositions of Bridgewater personnel for August, 1999, Attorney Albert of Bridgewater responded with scheduling concerns: "[T]here is a separate issue of individuals' scheduling conflicts.... we are also aware of a trade show scheduled

to force Bridgewater into contempt proceedings in South Carolina to enforce the subpoenas for those dates. *See* Fourth Affidavit of Ilan D. Barzilay, Docket No. 200, Ex. A (Correspondence between Gregory Baker and Michael Albert, August 6–16, 1999). Yankee was apparently trying to prevent these key Bridgewater employees from attending a trade show important to Bridgewater's business. This is persuasive evidence of improper motivation.

An inference of improper motivation can also be drawn from the economically coercive manner in which the case was prosecuted. Although, of course, counsel had the obligation zealously to represent Yankee, there comes a point where zealotry becomes abuse. To name a few examples, Yankee moved to take an unlimited number of depositions beyond those allowed by the Rules. (Magistrate Judge Neiman allowed an additional ten). Though it sought special dispensation to extend its

own discovery, Yankee made discovery exceedingly difficult for Bridgewater. At the preliminary injunction stage, it refused to produce its Rule 30(b)(6) witness from Springfield for deposition in Boston, claiming that the location was inconvenient. The cities lie less than 100 miles apart. On Bridgewater's motion to compel, Magistrate Judge Neiman ruled that Boston was not an inconvenient location for a Springfield witness—not a surprising outcome, since the Magistrate Judge had authored the only precedent directly on point: that Boston is not *per se* inconvenient for a Springfield witness. *See Littman v. Walgreen Eastern Co., Inc.,* No. Civ. A. 96–30018–MAP, 1998 WL 812399 (D.Mass., Nov.6, 1998).

Later, Bridgewater sought to depose Yankee's Rule 30(b)(6) witness on the tortious interference and ch. 93A claims. Yankee refused to appear, claiming that because the witness had been deposed once at the preliminary injunction stage,

---

for approximately August 16th through 19th which some of the individuals you have listed will be attending. We will do our best to work with you to resolve these scheduling issues." (Letter of Albert to Baker, August 6, 1999). In response, Attorney Baker wrote, "[Y]our effort to introduce 'scheduling conflicts' as a method of delaying the depositions is transparent. . . . Accordingly, we plan to go forward with the noticed depositions." (Letter of Baker to Albert, August 13, 1999, at 2). Albert objected that Bridgewater employees Aspy and Ruehl could not be deposed because of the trade show in New York, and suggested, "Why not just give me a call and see if we can agree on some dates that will work for everyone?" (Letter of Albert to Baker, August 13, 1999, at 2). Baker responded, by letter, "The depositions will go forward as noticed. . . . Of course, you knew that anyway, and are simply playing games. . . . Finally, you are in error when you suggest that we were previously told of 'scheduling conflicts' involving Aspy and Ruehl being at a trade show in New York. With each passing day, Bridgewater's excuses change, but its objective of avoiding discovery remains constant."

(Letter of Baker to Albert, August 14, 1999). Albert responded, "the August 16–19 trade show that you continue to claim we never told you about was referenced in my letter to you of August 6, as well as in conversations prior to that date." (Letter of Albert to Baker, August 16, 1999). Baker replied, "Where in my letter did I say you had not told us of a trade show? Answer: my letter does not say that. My letter states that we were not told of scheduling conflicts involving Aspy and Ruehl being at a trade show in New York. Your letter of August 6 . . . is perfectly opaque regarding who and where. . . . Where is there any reference [in the letter] to Aspy, Ruehl, or New York? Answer: there is none. Let me just add that the subsidiary reference in your letter of August 16 conjures up non-existent conversations from whole cloth. (If you persist in pursuing your fanciful story, tell me who discussed this matter with whom.) . . . Hence, your witnesses should either show up and sit for questions or secure a court ruling prior to such depositions excusing them from attending." (Letter of Baker to Albert, August 16, 1999.)

he did not have to be deposed again. However, the preliminary injunction deposition had been limited by agreement of the parties to preliminary injunction issues, which did not include the tortious interference claim. Bridgewater was forced to bring a motion to compel for this obviously necessary deposition, which Magistrate Judge Neiman allowed. This repeated insistence on motion practice over minor issues tends to show a motivation by Yankee to inflict economic harm on Bridgewater by employing egregiously aggressive litigation tactics.[6]

The failure seriously to consider settlement, either before or after the case was filed, is another factor contributing to an inference of improper motivation. Despite the weakness of its claims, Yankee consistently refused to accept mediation with someone having intellectual property expertise. Although refusal to negotiate or mediate obviously does not always merit fee-shifting, in the context of this case, combined with other factors, it serves as evidence of Yankee's motivation.

Instead of considering settlement, Yankee proceeded to summary judgment where it burdened the court with unnecessarily prolix and repetitive briefs. For example, Yankee filed a 100–page Memorandum of Law in Opposition (Docket No. 139) and a 114–page "response" to Bridgewater's 10–page statement of undisputed facts (Docket No. 140). Filing such enormous (and often unenlightening) documents unduly burdened both defendant and this court.

Taken as a whole, Yankee's hardball conduct in pursuing this litigation provides evidence of an improper motivation: to drain as much profit as possible out of a far smaller competitor. The attorneys' fees provision in the copyright act should serve to deter litigation conduct of this kind.

c. *Compensation and Deterrence.*

The final equitable factor noted in *Fogerty* is "the need in particular circumstances to advance considerations of compensation and deterrence." *Fogerty*, 510 U.S. at 534 n. 19, 114 S.Ct. 1023. This factor is especially pertinent where, as here, a large industry leader brings unreasonable claims against a much smaller competitor. *See Lotus*, 140 F.3d at 74–75. Denying attorneys' fees in such cases encourages dominant players to bury competitors in meritless lawsuits intended to lower profit margins. The expense for Bridgewater was substantial—it was forced to retain the specialized services of intellectual property attorneys in three different cities. An undisputed affidavit confirms that the cost of the litigation has cut into Bridgewater's profit margin tremendously, pushing it further into the red. *See* Affidavit of Scott Morris, Docket No. 191 (noting that since its founding, Bridgewater has operated at a loss of $629,444.20, even absent the impact of this litigation). Attorneys' fees can only partly remedy the harm this case has done to Bridgewater's business. Fees, of course, cannot compensate Bridgewater for having existed under a cloud of litigation since almost its incep-

---

**6.** Yankee's counsel's discourteous litigation style emerged in the very first argument, on plaintiff's motion for a preliminary injunction. Attorney Baker arrived in court with a reply memorandum in hand that he had not yet served on Bridgewater's counsel. The court was delayed approximately twenty minutes in hearing argument. Counsel sat in the court-room for this entire period, no more than six feet from brother counsel, yet chose *not* to hand him a copy of the reply until the court took the bench, putting Bridgewater's lawyer in the position of having to listen to argument and flip through a new brief at the same time. This kind of rudeness is the font of infinite lawyer jokes.

tion, nor for the substantial distraction of Bridgewater's personnel in dealing with this case. To the extent fees can go, however, they are warranted. The award should also serve to deter Yankee Candle and other market leaders from bringing overly aggressive and meritless suits against their smaller competitors.

### 2. *Purposes of the Copyright Act.*

Finally, in judging whether the equitable factors merit an award of attorneys' fees, the court must consider whether such an award will further the interests of the Copyright Act. This has been called the "touchstone" of the § 505 inquiry. *See Mitek Holdings, Inc. v. Arce Engineering Co., Inc.*, 198 F.3d 840, 842–43 (11th Cir. 1999). The purpose of the Act, as noted, is "to encourage the production of original literary, artistic, and musical expression for the good of the public." *Fogerty*, 510 U.S. at 524, 114 S.Ct. 1023. To do so, the act must enable "the raising of objectively reasonable claims *and defenses*, which may serve not only to deter infringement, but also to ensure that the boundaries of copyright law are demarcated as clearly as possible in order to maximize the public exposure to valuable works." *Mitek*, 198 F.3d at 842–43 (internal quotations and citations omitted, emphasis added).

The purposes of the Copyright Act provide the most compelling reasons for shifting fees here. Copyright defendants like Bridgewater must be permitted to mount meritorious defenses against the kind of claims brought here without fear of crippling fees. An overly restrictive approach

would ignore the realities of litigation and force small competitors to settle weak claims like Yankee's solely because the fight will be too costly to wage. This result would hinder legitimate competition and would chill original artistic expression. *See Fogerty*, 510 U.S. at 524, 114 S.Ct. 1023. Had Yankee Candle's complaint raised a novel issue of law or fact, or even put forward claims which could be called objectively reasonable, an award of fees might not serve the purposes of copyright law. *See, e.g., Lotus*, 140 F.3d at 75. But in the circumstances of this case, denying fees here would seriously undermine the purposes of the Copyright act, not promote them.

For these reasons, reasonable attorneys' fees will be granted for Bridgewater's defense under the Copyright Act.

### B. *Attorneys' Fees for Prevailing Defendants Under the Lanham Act*

■ In "exceptional cases" brought under the Lanham Act, a court "may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a) (1998). When the prevailing party is the plaintiff, an "exceptional" case is one involving "malicious, fraudulent, deliberate, or willful infringement." *Schroeder v. Lotito*, 747 F.2d 801, 802 (1st Cir.1984); *see also Volkswagenwerk Aktiengesellschaft v. Wheeler*, 814 F.2d 812, 821 (1st Cir.1987). The Court of Appeals so far has not had occasion to explain what makes a case "exceptional" where the prevailing party is a defendant.[7] 15 U.S.C. 1117(a).

7. Although Yankee asks the court to apply the standards for prevailing plaintiffs to this case, it is unclear how this could be accomplished. One of the factors making a case "exceptional" where plaintiffs prove infringement is the deliberateness of the violation. *See Schroeder*, 747 F.2d at 802. But while infringement of a trademark is only sometimes deliberate, pros-

ecution of a lawsuit always is. To apply this factor to prevailing defendants could mean that all prevailing defendants are entitled to fees, a result that fails to do justice to the word "exceptional." *See National Ass'n of Prof'l Baseball Leagues, Inc. v. Very Minor Leagues, Inc.*, 223 F.3d 1143, 1148 (10th Cir. 2000) (rejecting argument for parity in Lan-

Other Circuits are sharply split on this question. A rainbow of standards has been promulgated to define the word "exceptional" in the Lanham Act, some seemingly requiring bad faith or other culpability, others following a less stringent approach. *See, e.g., Nat. Ass'n. of Prof'l Baseball v. Very Minor Leagues,* 223 F.3d 1143, 1149 (10th Cir.2000) (holding fees justified where suit was "unfounded" or brought for "harassment and the like," rejecting strict "bad faith" standard); *Stephen W. Boney, Inc. v. Boney Services, Inc.,* 127 F.3d 821, 827 (9th Cir. 1997) (bad faith is sufficient, but not always necessary); *Door Systems, Inc. v. Pro–Line Door Systems, Inc.,* 126 F.3d 1028, 1032 (7th Cir.1997) (rejecting bad faith as standard, holding "oppressive" suits "in which the case for an award of fees to the defendant is compelling" to be standard for "exceptional"); *Conopco, Inc. v. Campbell Soup Co.,* 95 F.3d 187, 194 (2d Cir.1996) (allowing recovery only "on evidence of fraud or bad faith,"); *Scotch Whiskey Ass'n v. Majestic Distilling Co., Inc.,* 958 F.2d 594, 599 (4th Cir.1992) (holding that presence of bad faith is not prerequisite of award of fees); *Noxell Corp. v. Firehouse No. 1 Bar–B–Que Rest.,* 771 F.2d 521, 526 (D.C.Cir.1985) ("Something less than 'bad faith' ... suffices to mark a case as 'exceptional' "). Simply put, judges' efforts to construe this term "exceptional" in the Lanham Act has caused exceptional variation among the circuits.[8]

Though it has not decided the issue squarely, the Court of Appeals has pointed away from a strict standard of bad faith in the fees inquiry. In *Volkswagenwerk,* a case concerning an award of fees to a plaintiff, the Court interpreted the legislative history to require consideration of the equities involved.

> Legislative history, though sparse, indicates that attorney's fees may be appropriate 'where justified by equitable considerations,' including those where the acts of infringement were 'malicious,' 'fraudulent,' 'deliberate,' or 'willful.' Under the statute, the award of attorney's fees is left to the discretion of the district court, and it may as well award attorney's fees to a prevailing defendant.

*Volkswagenwerk,* 814 F.2d at 821, *quoting* S.Rep. No. 1400, 93rd Cong., 2d Sess. 5, *reprinted in* 1974 U.S.Code Cong. & Admin. News 7132–33 (internal citations omitted). Further examination of the Senate Report cited by the First Circuit suggests that something less than a strict standard of bad faith or frivolousness should guide the court's equitable discretion.

ham Act fees inquiry on ground that underlying conduct under scrutiny is different); *Door Systems, Inc. v. Pro–Line Door Systems, Inc.,* 126 F.3d 1028, 1031–32 (7th Cir.1997) (same); *but see Conopco, Inc. v. Campbell Soup Co.,* 95 F.3d 187, 194–95 (2d Cir.1996) (rejecting different standards for prevailing plaintiffs and defendants, and requiring bad faith for both).

**8.** District Court Judges in this Circuit have also wrestled with this issue. *Compare Gillette Co. v. Norelco Consumer Prods. Co.,* 69 F.Supp.2d 246, 267–68 (D.Mass.1999) (declining to award fees because plaintiff not motivated by bad faith and achieved some success on the merits) *and Ultra–Temp Corp. v. Advanced Vacuum Sys., Inc.,* 189 F.R.D. 17, 21–25 (D.Mass.1999) (declining to award fees against plaintiff in patent case, construing identical standard of "exceptional cases" in 35 U.S.C. § 285 to require showing of frivolousness by clear and convincing evidence) *with La Amiga del Pueblo, Inc. v. Robles,* 748 F.Supp. 61, 63 (D.P.R.1990) (holding that "exceptional" means "slightly less than bad faith," such that defendant may recover "where plaintiff's claims are designed to harass or are so unfounded as to be frivolous or patently baseless").

The bill would also permit prevailing defendants to recover attorney fees in exceptional cases. This would provide protection against unfounded suits brought by trademark owners for harassment and the like.

.  .  .  .  .

Section 3 provides that attorney fees may be awarded to the prevailing party in actions under the federal trademark laws, when equitable considerations justify such awards. It would ... give defendants a remedy against unfounded suits.

*Id.* at 7136–37.

The legislative history thus mentions both a subjective inquiry, the suit's motivation of "harassment and the like," and an objective consideration, the "unfounded" nature of the suit, all to be evaluated under "equitable considerations." *Id.* Nowhere does the text or history of the statute necessarily restrict an award of fees to a showing of outright bad faith. Indeed, courts have always had the inherent power to award attorneys' fees for suits brought "in bad faith, vexatiously, wantonly, or for oppressive reasons." *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 258–59, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975); 1 ROBERT L. ROSSI, ATTOR-NEYS' FEES 346 (2d Ed.1995). The statute, which was passed against this background principle, should not be presumed to enact mere surplusage. *See Noxell,* 771 F.2d at 526; *cf. Lieb,* 788 F.2d at 155.

The most persuasive cases on the standard for attorneys' fees are consistent with the Senate Report cited in *Volkswagenwerk:* that courts should consider the exceptional nature of the case under the totality of the circumstances, applying traditional principles of equity. *See Securacomm Consulting, Inc. v. Securacomm, Inc.,* 224 F.3d 273, 281 (3d Cir.2000); *Very Minor Leagues,* 223 F.3d at 1146–49 (10th Cir.2000); *Noxell,* 771 F.2d at 526–27 (D.C.Cir.1985). By using the phrase "equitable considerations" in the Senate Report to describe what is "exceptional," "Congress intended to invoke the tradition of equity, a hallmark of which is the ability to assess the totality of the circumstances in each case." *Securacomm,* 224 F.3d at 281. As the Third Circuit has stated, "whether a case qualifies as exceptional ultimately turns on consideration of the equities in full." *Id.* The court may examine the plaintiff's "litigating conduct," *id.* at 280; whether plaintiff's behavior included "economic coercion," *Noxell,* 771 F.2d at 526; plaintiff's use of "groundless argument[s]," *id.* at 527; failure to cite controlling law, *id.,* and the generally "oppressive" nature of the case, *Door Systems,* 126 F.3d at 1032. A showing of bad faith would satisfy this standard, but is not necessary. *See Boney,* 127 F.3d at 827.

Whatever the uncertainty of the law, this case is easy, because it is "exceptional" under virtually any standard. In addition to the abusive and expensive litigation conduct noted above, Yankee's claims under the Lanham Act were unfounded— that is, "the plaintiff's suit [lacked] any reasonable foundation." *Very Minor Leagues,* 223 F.3d at 1147. The strongest of these claims (at least at the time it was made) was probably for infringement of the overall "look and feel" of the candles,[9]

---

9. The other two Lanham Act claims were rejected more summarily. Yankee's "Vertical Display System," the court held, was simply a method of displaying candles by color and therefore was entirely functional. *See Yankee,* 99 F.Supp.2d at 151–52. As for the layout of Bridgewater's catalogue, the court stated: "No fair minded person, looking at Bridgewater's document, could possibly view it as an attempt to 'pass off' the Bridgewater catalogue as the Yankee one." *Yankee,* 99 F.Supp.2d at 156.

yet even this argument bordered on frivolous. To meet this test, the "design, shape or combination of elements" of the Housewarmer candles had to be "so unique, unusual or unexpected in this market that one can assume without proof that it will automatically be perceived by customers as an indicator of origin—a trademark." *I.P. Lund Trading ApS v. Kohler Co.,* 163 F.3d 27, 40 (1st Cir.1998), *quoting* 1 McCarthy On Trademarks § 8:13. Absolutely no evidence was produced in support of this theory. Indeed, even if the Supreme Court had not subsequently deprived plaintiff of the entire legal basis for this claim, *see Wal–Mart Stores, Inc. v. Samara Bros., Inc.,* 529 U.S. 205, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000), it was doomed at the outset, because there was no evidence that the overall look and feel of the candles or their labels was at all "source-identifying," or "likely to serve primarily as a designator of origin of the product." *Lund,* 163 F.3d at 41.

Considering all the circumstances, including Yankee's aggressive pursuit of unfounded claims and use of predatory litigation strategies, this is an exceptional case meriting a shift in fees.

### C. *Attorneys' Fees Under State Claims*

■ Bridgewater also seeks attorneys' fees for Yankee's three state claims. As noted above, these include a count for common law trade dress infringement, for tortious interference with business relations, and for deceptive trade practices pursuant to Mass. Gen. L. 93A, § 11. Ordinarily, recovery of attorneys' fees is only granted when there is explicit statutory authorization, or the case fits into one of the recognized non-statutory exceptions to the "American Rule" of non-recovery. *See generally* 1 Robert L. Rossi, Attorneys' Fees 335–354 (2d ed.1995). None of the state or common law claims brought here

expressly provides for attorneys' fees, and the state claims were not pursued "in bad faith, vexatiously, wantonly, or for oppressive reasons." *Alyeska Pipeline,* 421 U.S. at 258–59, 95 S.Ct. 1612. Thus, it would appear Bridgewater could not recover for fees defending the state law claims had they been brought alone.

However, Bridgewater argues that its defense of the state claims was so intertwined with its defense of the federal copyright and trademark counts that trying to segregate them would be futile. The Supreme Court has recognized that where a state law claim overlaps or is intertwined with a federal claim, it may be impossible to parse out hours reasonably expended for each. *See Hensley v. Eckerhart,* 461 U.S. 424, 435, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). Much of counsel's time in such cases "will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis." *Id. See also Phetosomphone v. Allison Reed Group,* Inc., 984 F.2d 4, 7 (1st Cir.1993). Indeed, many of the claims in this case centered around the same nucleus of alleged facts: Bridgewater's supposed copying of Yankee's labels, catalogue and display system. *See* Plaintiff's Opp. to Defendant's Motions for Summary Judgment, Docket No. 139, at 96.

Yankee objects to treating the state and federal claims as inseparable. In one respect, the court will accept its argument. The tortious interference claim, as narrowed by the court, survived summary judgment. Despite Yankee's attempt to blend the issues, this count centered on a different nucleus of facts than the copyright and trade dress claims—that of an alleged misrepresentation by Bridgewater to one of Yankee's customers to the effect that Bridgewater had taken over Yankee. Although this aspect of Yankee's case never made it to trial, the court will reduce

the amount of fees Bridgewater has sought by ten percent to account for Yankee's partial success. In all other respects, however, the state law claims rested on violations of federal trademark and copyright law, making the claims sufficiently interwoven to make further segregation impossible. *See Hensley,* 461 U.S. at 435, 103 S.Ct. 1933.

### D. *Amount of Fees.*

Finally, the court must determine how large an award to grant. Courts in this Circuit must apply the "lodestar" approach to calculation of fee awards: a determination of the hours reasonably spent on this case, multiplied by a reasonable rate. *See Coutin v. Young & Rubicam Puerto Rico, Inc.,* 124 F.3d 331, 337 (1st Cir.1997). To determine the hours reasonably expended, courts typically look at the actual hours spent by counsel as established by adequate contemporaneous billing records, then "subtract from that figure hours which were duplicative, unproductive, excessive or otherwise unnecessary." *Grendel's Den v. Larkin,* 749 F.2d 945, 950 (1st Cir.1984). A reasonable rate is "that prevailing in the community for similar work." *Maceira v. Pagan,* 698 F.2d 38, 40 (1st Cir.1983).

Bridgewater has submitted detailed billing records to support its request for $1,131,369 in attorneys' fees and $132,652 in costs. The fee request represents 6,541.1 hours of attorney work over two years, billed at rates ranging from $125 to $320 per hour. Also included in the request is 962.5 hours of work by clerks and paralegals, billed at rates of $45 to $140 per hour. *See* Affidavit of Michael A. Albert, Docket No. 203.

After the billing records are examined and a lodestar has been identified, courts may raise or lower the award in certain circumstances. *Coutin,* 124 F.3d at 337.

For example, courts may exercise discretion "to tailor fee awards in light of the behavior of the parties during litigation." *Lotus,* 140 F.3d at 76, n. 5; *see also Matthew Bender & Co., Inc. v. West Pub. Co.,* 240 F.3d 116, 124 (2d Cir.2001). Judges may also look to the level of success the prevailing party obtained: the more impressive the results, the more reasonable the hours expended on the case will be. *See Hensley,* 461 U.S. at 435, 103 S.Ct. 1933 (1983).

### 1. *Attorneys' Fees.*

### a. *Reasonable Rate.*

■ To determine a reasonable rate of payment, courts generally begin with the fee application itself. The rates actually billed by the attorneys in this case increased over the course of the litigation, along with the rates of Boston attorneys generally. Attorney Albert, for example, began his work on the case billing at $225 per hour; by the time the case was over, his rate was $320 per hour.

The court is satisfied that the rates charged by Bridgewater's counsel are reasonable, and represent prevailing market rates for services of the kind that counsel performed here. Yankee suggests that the rates charged by Boston counsel are too high, and that local Springfield rates should prevail. However, this was an intellectual property case. The First Circuit has held that where the client reasonably hires counsel from outside the community to perform specialized work, a reasonable rate in the attorney's city of origin will be awarded. *Maceira,* 698 F.2d at 40; *see also Stanton v. Southern Berkshire Reg'l Sch. Dist.,* 28 F.Supp.2d 37, 42 (D.Mass. 1998). Bridgewater, a South Carolina company, can certainly be forgiven for looking to a large Boston law firm to defend an intellectual property suit in Springfield. Yankee itself does not argue

that the claimed rates are greater than those billed in the Boston legal market generally during the course of this lawsuit. In fact, the rates ($135 to $200 for associates and $300 to $320 for partners) are quite reasonable for the Boston area. *See Guckenberger v. Boston University,* 8 F.Supp.2d 91, 105 (D.Mass.1998) (approving rates ranging from $140 to $325 for civil rights attorneys); *Arthur D. Little Int'l, Inc. v. Dooyang Corp.,* 995 F.Supp. 217, 224 n. 1 (D.Mass.1998) (finding rate of $325 per hour reasonable for litigation partner in large Boston firm). These rates will therefore be used in calculating the lodestar amount.

Yankee does not specifically challenge the rates charged for the South Carolina attorneys who worked on this case, which range between $150 and $225 per hour. The court will accept them as reasonable.

b. *Hours Reasonably Spent.*

The court must next determine the number of hours reasonably spent in the litigation and multiply it by the reasonable hourly rate. The court must calculate the time counsel spent on the case and subtract duplicative, unproductive or excessive hours. *See Gay Officers Action League v. Commonwealth of Puerto Rico,* 247 F.3d 288, 295 (1st Cir.2001). In calculating such hours, the court begins with counsel's actual billing sheets.

As noted above, counsel billed for 6,541.1 hours of work in this case. Yankee strenuously objects to this amount of time. Indeed, their attitude toward justifiable fees is illustrative of their "take no prisoners" approach to this entire litigation. Although the Supreme Court has advised that "[a] request for attorney's fees should not result in a second major litigation," Yankee has attempted to do just that, by seeking to file interrogatories demanding billing information from opposing counsel,

and even asking for leave to depose them. *Hensley,* 461 U.S. at 437, 103 S.Ct. 1933. Yankee has also taken an unreasonably sharp position about the amount of time necessary for Bridgewater to defend against this aggressive suit. For example, Yankee labels literally *all* the time billed by Attorney Albert and his colleagues in preparing Bridgewater's able Reply at the summary judgment stage as "[u]nproductive, duplicative or excessive time reviewing, drafting, editing, or filing." *See* Highlighted and Annotated Billing Sheets, Docket No. 209, Ex. C, Billing Sheets dated April 5, 2000. Never mind that this clear and well-organized 50–page brief was filed in response to Yankee's own 100–page Opposition and 114–page "response" to defendant's statement of undisputed facts, and was followed by yet another 20–page surreply from Yankee. *See* Defendant's Reply, Docket No. 150.

In fact, Bridgewater has shown considerable restraint in its fee request. Numerous redactions appear in the time sheets, representing time spent on the case for which Bridgewater is not seeking compensation. Though plaintiff's claim was weak, the stakes in this matter were high: the lawsuit could have spelled the end of the Bridgewater Candle Company. It is thus understandable that Bridgewater responded vigorously. Given the redactions, and the decision to claim nothing for the time spent preparing its fee request, Bridgewater's overall claim for $1.1 million emerges generally as more than fair.

■ In three respects, however, the court will depart from Bridgewater's request in identifying the lodestar. First, the court will strike billings for travel time associated with this case. Although travel is a necessary consequence of litigation where a party has been sued in a distant jurisdiction, the First Circuit has declined to award fees at a professional rate for

time spent in transit. *See Furtado v. Bishop,* 635 F.2d 915, 922 (1st Cir.1980). The court has calculated the non-compensable travel time billed in this case as follows.

| | |
|---|---:|
| *Dority & Manning* | |
| Attorney Richard M. Moose: | $ 19,945 |
| Clerk, Dority & Manning | $ 203 |
| | |
| *Foley, Hoag & Eliot* | |
| Michael Albert | $ 3,795 |
| Katherine M. Hamill | $ 405 |
| Margaret E. McKane | $ 125 |
| | |
| *Wolf, Green & Sacks* | |
| Michael Albert | $ 8,415 |
| Ilan D. Barzilay | $ 1,020 |
| Total: | $ 33,908 |

Accordingly, Bridgewater's fee request will be reduced by $33,908.00.

■ Second, as noted above, the court will reduce the requested fee amount by ten percent because of the continued vitality of Yankee's tortious interference claim. This works out to a reduction of $103,589.30 from the total fee request. This ten percent is calculated after subtracting the award for clerks and paralegals, below, and the travel reduction.

■ Third, the court will reduce the amount Bridgewater has sought by an additional ten percent to account for excessive hours, duplication of services, and fruitless pursuits. *See Gay Officers Action League v. Commonwealth of Puerto Rico,* 247 F.3d 288, 295 (1st Cir.2001). The primary reason for this reduction is the rather substantial amount of time Bridgewater's attorneys spent in conferences with each other. Although communication with co-counsel is a necessary function of a multiple-attorney defense, the time here appeared to have passed the excessive mark, though by a modest margin. *See In re Olson,* 884 F.2d 1415, 1429 (reducing fee award because of excessive hours spent conferencing).

There were also certain inefficiencies in the representation that contribute to the ten percent reduction. For example, Attorney Albert, the chief Boston counsel for Bridgewater, changed firms mid-stream, reducing efficiency somewhat. Counsel also appear to have spent some time pursuing issues of dubious relevance, such as Yankee's possible environmental troubles.

The court will not attempt to reduce fees attorney-by-attorney. The run-on nature of the billing sheets submitted by counsel makes an exact tabulation of the time spent on these activities impractical. Several different tasks are mentioned in most of the billing entries. Additionally, no one attorney appears to have spent a greater percentage of his or her time in excessive conferences or in fruitless efforts.

The total fee request will be reduced by an additional ten percent, at a cost of $103,589.30 (after subtraction of the paralegal award and travel time). Under the circumstances, the total of $828,714.40 is a fair and reasonable result. *See Grendel's Den,* 749 F.2d 945, 952 (1st Cir.1984). Yankee will be ordered to pay a total of $828,714.40 in attorneys' fees.

### 2. *Clerks and Paralegals.*

■ Bridgewater has also requested compensation for the work of clerks and paralegals. Contrary to Yankee's claims, the time of clerks and paralegals is compensable in this Circuit. *See In re San Juan Dupont Plaza Hotel Fire Litigation,* 111 F.3d 220, 231 n. 10 (1st Cir.1997).

■ Bridgewater's affidavit seeks compensation for 962 hours of paralegal time, billed at rates ranging from of $45 to $140 per hour. From the court's review of the hours billed by the paralegals and clerks, there appeared to be an unusually large number of hours spent "indexing" files, discovery, and other papers. The court will accordingly reduce the number of

paralegal hours by twenty percent, to 769.6 hours. However, the requested rates of $45 and $60 per hour are on the extreme low end of the scale for paralegals, while $140 per hour seems quite high. *See, e.g., In re LearningSmith, Inc.,* 247 B.R. 581, 583 (Bankr.D.Mass.2000) (finding $110 per hour to be reasonable Boston paralegal rate). The court will multiply the reasonable hours, 769.6, by a reasonable mid-range rate for paralegals, $80 per hour. This works out to $61,568 for paralegal and clerk time.

### 3. *The Lodestar.*

Based on the foregoing, the lodestar is $828,714.40 in attorneys' fees and $61,568 for clerk and paralegal fees, for a total of $890,282.40. Neither party has moved to depart from the lodestar, and there is no reason to do so. There certainly is no call to lower it; Bridgewater's success here was almost absolute in that Yankee's major claims were all dispatched on summary judgment. In this situation, defendant should receive "a fully compensatory fee." *Hensley,* 461 U.S. at 435, 103 S.Ct. 1933.

Plaintiff will be ordered to pay defendant $890,282.40 in fees.

### E. *Costs.*

Both the Copyright and Lanham Acts allow for the assessment of costs for prevailing parties. *See* 17 U.S.C. § 505; 15 U.S.C. § 1117. Bridgewater has submitted a detailed and contemporaneous itemization of the costs of the litigation, down to each photocopy and facsimile charge. *See* Affidavit of Michael A. Albert, Ex. A–D (Docket No. 205). The request amounts to $132,652. Yankee has not leveled any specific challenges to the request for costs.

In one respect, however, the request for costs will be reduced. The firms of Foley, Hoag & Eliot and Wolf, Greenfield & Sacks both included costs of computer-aided research in their requests. The growing consensus of the courts is that such expenditures are more properly considered firm overhead, not a compensable cost. *See, e.g., In re Continental Illinois Sec. Litig.,* 962 F.2d 566, 570 (7th Cir.1992) (holding computer assisted legal research to be firm overhead); *Fleet Bank of Maine v. Steeves,* 793 F.Supp. 18, 24 (D.Me.1992) (same); *but see Aloha Tower Assoc. Piers 7, 8 and 9, Ltd. P'ship v. Millennium Aloha, Inc.,* 938 F.Supp. 646 (D.Haw.1996) (holding computer-assisted research to be a "cost"). The court has calculated the amount billed for electronic research as follows.

| | |
|---|---|
| Foley, Hoag, & Eliot | $ 8,660.63 |
| Wolf, Greenfield & Sacks | $ 6,593.30 |
| Total: | $15,253.93 |

The court will therefore order plaintiff to pay the defendant the following in costs: $63,814.00 for costs paid by Dority & Manning, P.A.; $26,627.37 for Foley, Hoag & Eliot; $26,935.70 for Wolf, Greenfield & Sacks, P.C.; and $21.00 for the McQueen Law Firm, P.C., for a total of $117,398.07.

### IV. CONCLUSION

To summarize the above calculations, the court has awarded defendant its request for fees with the following modifications. First, the court reduced the request by $33,908 to account for time spent in travel. It then separated out from the fee request the award it granted for clerks and paralegals, $61,568, which represents 769.6 hours of work at $80 per hour. It subsequently reduced the modified attorneys' fees amount by ten percent, or $103,589.30, to account for the continued viability of the tortious interference claim, and an additional ten percent for excessive hours and duplication of services. This comes to a lodestar fee total, including paralegal fees, of $890,282.40. Finally, the court is assessing $117,398.07 in costs,

which comprises defendant's request minus the costs charged for computer-assisted legal research.